THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NASTASHA BURDYN          :
         :
        **Plaintiff,**          :
         :
**v.**          :     **3:12-CV-2236**
         :     **(JUDGE MARIANI)**
**OLD FORGE BOROUGH**, et al.          :
         :
        **Defendants.**          :

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is Defendant Old Forge Borough's Motion for Summary Judgment (Doc. 186). Defendant Old Forge Hose & Engine Company ("OFHE") also filed a motion for summary judgment (Doc. 165) which the Court will address in a separate opinion. The parties have fully briefed the motion, and it is ripe for decision. For the reasons set forth below, Defendant's motion for summary judgment will be denied.

### II. PROCEDURAL HISTORY

Plaintiff, Jane Doe, filed her complaint (Doc. 1) on November 9, 2012 and subsequently filed an amended complaint on December 3, 2014 (Doc. 125). Plaintiff's amended complaint named as Defendants Old Forge Borough, Old Forge Police Department, Old Forge Fire Department, Old Forge Hose & Engine Company, Lawrence Semenza, Walter Chiavacci, and James Krenitsky, and set forth 22 counts including violations of Plaintiff's rights under 42 U.S.C. § 1983 against the Old Forge Borough, Old

Forge Police Department, Old Forge Fire Department, Semenza, and Krenitsky (Counts I-V); violation of the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255(a), by Semenza, Krenitsky, and Chiavacci (Count VI); childhood sexual abuse and vicarious liability (Count VII), negligence (Count VIII), negligent supervision (Count IX), and premises liability (Count X) by Old Forge Hose & Engine Company; negligence by Semenza and Krenitsky (Counts XI-XII); negligence per se by Semenza, Krenitsky, and Chiavacci (Counts XIII-XV); assault and battery by Semenza, Krenitsky, and Chiavacci (Counts XVI-XVIII); negligent infliction of emotional distress by Semenza, Krenitsky, and Chiavacci (Counts XIX-XXI); and punitive damages against the Old Forge Hose & Engine Company, Semenza, Krenitsky, and Chiavacci (Count XXII).

Each Defendant, with the exception of Chiavacci[1] and the Old Forge Hose & Engine Company, filed motions to dismiss. On July 1, 2015, the Court ruled on the motions, dismissing Defendants Old Forge Fire Department and Old Forge Police Department, and dismissing Count V (42 U.S.C. § 1983 - violation of substantive due process (actions of person with final authority)), Count VI (18 U.S.C. § 2255(a)), Counts XI and XII (negligence), Counts XIII and XIV (negligence per se), and Counts XIX and XX (negligent infliction of emotional distress). (Docs. 176, 178). The Court also ruled that Plaintiff could not proceed using a pseudonym and ordered Plaintiff to re-file her amended complaint using her legal

---

[1] Upon Plaintiff's request, the Clerk of Court entered default against Chiavacci on January 16, 2013 (Doc. 41).

2

name. Plaintiff thereafter filed an amended complaint on July 14, 2015 (Doc. 179) wherein

the addition of her name, Nastasha Burdyn, constituted the only change.

### III. STATEMENT OF UNDISPUTED FACTS

Defendant, Old Forge Borough has submitted a Statement of Material Facts (Doc.

187) as to which it submits there is no genuine issue or dispute for trial. Plaintiff submitted a

"Counterstatement of Material Facts" (Doc. 202) [2] with the result being that the following

facts have been admitted except as specifically noted:[3]

Plaintiff, Nastasha Eleanor Burdyn, was born March 30, 1989. (Doc. 187, at ¶ 9;

Doc. 202, at ¶ 9). The alleged events involving Defendants Lawrence Semenza and James

Krenitsky and Plaintiff occurred between 2004 and 2007 during Plaintiff's high school years

---

[2] Instead of responding to each of Defendant's numbered paragraphs with "admitted" or "denied", Plaintiff responds with "not contested", "contested", or "contested to the extent that . . . ." The Court deems these statements to mean "admitted", "denied", or "admitted in part and denied in part" respectively.

[3] Defendant Semenza also submitted a "Response in Opposition to Defendant, Borough of Old Forge's, Statement of Undisputed Facts" (Doc. 196) wherein he "denie[s]" or "denie[s] as stated" many of Old Forge Borough's statements of material facts that relate to the events alleged to have occurred between Semenza and Burdyn. Semenza's denials are based on the fact that he was found not guilty in a criminal trial of the charges of Aggravated Indecent Assault, Unlawful Contact with a Minor, Indecent Exposure, and Indecent Assault, and that, at the time of the filing of Semenza's Response to Old Forge Borough's statement of material facts, Semenza was appealing his criminal convictions for Corruption of Minors and Person to Report Suspected Child Abuse. (See generally, Doc. 196).

The Court takes judicial notice of the fact that, in September 2015, the Superior Court of Pennsylvania vacated Semenza's criminal convictions for Corruption of Minors and Person to Report Suspected Child Abuse, and ordered a new trial be held. See Commonwealth of Pennsylvania v. Semenza, 127 A.3d 1 (Pa. Super. Ct. 2015). Following the Superior Court's decision, Semenza pled guilty to Harassment pursuant to 18 Pa.C.S.A. § 2709 and the charges of Corruption of Minors and Person to Report Suspected Child Abuse were nolle prossed.

Because the standard of proof is lower in a civil case than a criminal case and therefore Semenza's lack of convictions is not dispositive, and drawing all reasonable inferences in favor of Plaintiff as the non-moving party, for purposes of this motion the Court finds that there is a genuine issue of material fact as to what occurred between Defendant Semenza and the plaintiff.

as a sophomore, junior, and senior. (Doc. 187, at ¶ 10). Burdyn testified that in 2004, Semenza was the captain of the fire department and Krenitsky was a police officer with the Old Forge Borough. (Id. at ¶ 15).

Defendant James Krenitsky was hired by the Borough of Old Forge as a part-time police officer in 1998 and became a full-time police officer with the Borough in November, 2001. (Doc. 187, at ¶¶ 1, 2; Doc. 202, at ¶¶ 1, 2; Proffer of James Krenitsky, Aug. 30, 2013, at 6-7). Although Krenitsky formally became Captain of the Old Forge Police Department on December 11, 2005 (Doc. 187, at ¶ 4), he testified that he "unofficially took the role of extra duties other than patrol" and was the "second guy in charge" of the Police Department after Chief Avvisato retired, and Captain Biancardi resigned, and Defendant Semenza was named Officer in Charge of the Department, on or about February 1, 2005 (Proffer of Krenitsky, at 10-11).[4]

Krenitsky first met Plaintiff Burdyn when she became a member of the OFHE in the summer of 2004. (Doc. 187, at ¶ 5). Krenitsky testified that his encounters with the plaintiff occurred when he was "out the back" of the building[5] and Plaintiff would come out and they would talk. They would then go in to the bunk room of the volunteer fire department and engage in oral sex. (Doc. 187, at ¶ 7; Doc. 202, at ¶ 7; Proffer of Krenitsky, at 16-17). Burdyn stated that the sexual relationship with Krenitsky did not involve sexual intercourse.

---

[4] Former Old Forge Police Chief Avvisato retired at the end of 2004 and Semenza was appointed Officer in Charge on January 31, 2005. (Doc. 187, at ¶ 3).

[5] According to Burdyn, "[t]he Borough building in Old Forge has three parts of it, it's the Borough building, the firehouse, as well as the police station." (See Trial Tr., Oct. 16, 2013, at 71).

4

(Doc. 187, at ¶ 13). Plaintiff asserted that her sexual relationship with Krenitsky commenced in January 2005 and ended in mid-June 2005 and that all "encounters" occurred in the bunk room of the volunteer fire company. (Doc. 187, at ¶ 11; Doc. 202, at ¶ 11).

Defendant Krenitsky pled guilty to his criminal conduct with the Plaintiff. (Doc. 187, at ¶ 28).

Burdyn's sexual relationship with Semenza began sometime prior to her sixteenth birthday in 2005 and ended in 2007. (Doc. 187, at ¶ 12; Doc. 202, at ¶ 12).[6] Burdyn stated that the sexual relationship with Semenza did not involve sexual intercourse and that she did not have oral sex with Semenza. (Doc. 187, at ¶ 13).

The parties agree that Plaintiff testified that her sexual encounters with Defendant Semenza took place in the firehouse kitchen and in the sitting area of the firehouse (Doc. 187, at ¶ 25; Doc. 202, at ¶ 25). However, as Plaintiff points out, the sexual encounters allegedly also took place during "at least one over-night training" and in an Old Forge Borough police cruiser. (Doc. 202, at ¶ 25) (see e.g., Trial Tr., Oct. 16, 2013, at 93-95; Trial Tr., Oct. 18, 2013, at 207-214).

---

[6] Plaintiff "contest[s]" Old Forge's statement of material fact "to the extent that Plaintiff did not testify that Defendant Semenza's inappropriate contact with Plaintiff occurred sometime prior to her sixteenth (16) birthday and the testimony cited to by Old Forge Borough does not support its statement." (Doc. 202, at ¶ 12). Although Plaintiff is correct that Old Forge does not provide a correct citation, Plaintiff did testify multiple times during Semenza's trial that she began engaging in sexual acts with him prior to her sixteenth birthday. (See e.g., Trial Tr., Oct. 16, 2013, at 109, 111-112, 197).

Plaintiff also stated that, on occasion, Semenza engaged in boorish behavior and made crude comments, including "[t]alking about [her] body[, t]alking about [her] chest[, t]alking about [her] friend's chest", and calling her his "sexy girlfriend", as well as telling her that he wanted to have sex with her. According to Plaintiff, many of these comments were made in front of other people, including members of the Old Forge fire department and police department. (Doc. 187, at ¶ 24; Doc. 202, at ¶ 24; Dep. of Burdyn, at 265-267, 311-312).

Burdyn testified that she never reported the sexual relationship with Semenza or Krenitsky to the police prior to May 2, 2012. (Dep. of Burdyn, at 262). Plaintiff did not tell anyone at the Borough of Old Forge about the events with Semenza or Krenitsky and although Plaintiff attended some Old Forge Borough council meetings, she never reported these events to any Old Forge Borough official. (Doc. 187, at ¶¶ 14, 23). When asked whether she "ever complain[ed] to anyone at the Old Forge Borough, be it a Council person, be it the Mayor, did [she] ever complain to any Borough of Old Forge official about the conduct of Mr. Krenitsky or the conduct of Mr. Semenza of which [she] now complain[s] in this lawsuit", Plaintiff testified that she did not and explained that she "didn't feel it necessary at the time." (Dep. of Burdyn, at 304). Krenitsky also stated that he did not inform anyone of his sexual encounters with Burdyn, including Defendant Semenza. (Doc. 187, at ¶ 8).

Burdyn testified that her sexual relationship with Semenza and Krenistky "was no one's business" and that she did not want Semenza or Krenitsky to inform anyone that they

6

were having a relationship with her. (Doc. 187, at ¶¶ 16, 17). Plaintiff also acknowledged

that Semenza and Krenitsky never told her that she needed to hide the relationship with

them and that "it was assumed" that she would not tell anybody about the relationship.

(Doc. 187, at ¶ 19; Doc. 202, at ¶ 19; Dep. of Burdyn, at 258). Plaintiff admitted that

Semenza and Krenitsky never threatened her or coerced her into doing anything of a sexual

nature. (Doc. 187, at ¶ 20). Plaintiff also testified as follows:

> **Q.** Did they [Krenitsky and Semenza] ever indicate to you that if you didn't
> continue with your relationship, that your membership [in the OFHE] would
> end?
> **A.** No.
> **Q.** Did they ever threaten you in any way?
> **A.** No.
> **Q.** Did they ever tell you that if you told anyone that there were consequences
> to that?
> **A.** No.
> **Q.** Did any of them ever use their position to coerce you into doing something
> you didn't want to do?
> **A.** I don't believe they used it against me or said it to me, but I would -- I
> believe personally that they had a position of power and -- excuse me, I had --
> they had a position of power, and I believed in them and I trusted them. So
> why would I think something was wrong if the chief of police is okay with it or
> the captain of the police department or police officer or captain of the fire
> department for that matter.

(Dep. of Burdyn, at 261-262).

Burdyn testified that she never "saw with [her] own eyes" any witnesses to any of the

sexual encounters between herself and Semenza and Krenitsky. (Doc. 187, at ¶ 16; Doc.

202, at ¶ 16; Dep. of Burdyn, at 252-253). However, multiple individuals, including borough

employees testified to having seen arguably inappropriate behavior between Semenza and

Burdyn. For example, at Semenza's criminal trial, Steven Lowe, a police officer with the Old

Forge Borough from 2003 through 2008, testified that he had witnessed activities between

Burdyn and Semenza that caused him alarm. (Trial Tr., Oct. 17, 2013, at 285, 286). Lowe

recounted an episode that occurred on Halloween of 2004 when Semenza allegedly pulled

Burdyn into his lap in the Police Department while Plaintiff was dressed in a "black costume,

short skirt." (Id. at 287). Lowe also testified about several incidents in the fire department,

including once seeing Semenza and Burdyn sitting "a few inches apart" on the couch in the

front room, covered by a blanket and seeing Semenza "up on top of [Burdyn] with his arms

on the sides standing fairly close, pressed up against her" in the fire department kitchen.

(Id. at 288-291). Lowe further testified that, on multiple occasions between 2005 and 2007

in the Police Department, Semenza "stated to her and without her present also stated that

he'd like to take her next door and have sex with her." (Id. at 291-293). Tammy Eastwood,

an employee of the Old Forge Ambulance from 1999 to 2008, testified at Semenza's

criminal trial that her understanding of Semenza and Burdyn's relationship was that it was

"pretty intimate." (Trial Tr., Oct. 18, 2013, at 207-208). Eastwood further testified that she

saw the following:

> On two different occasions that really stick out, that really stick out in my
> mind, one time Nastasha was already there at the firehouse, Larry [Semenza]
> had pulled in with the cruiser. She had come running over to him. He had
> turned and put his left leg out of [the] car, she climbed in, was on his lap. I
> could see only his left hand up and down his [sic] back, first over the clothing,
> down the legs, up the back of the shirt and eventually underneath the shirt
> down the back of the pants.

8

(*Id*. at 209). Eastwood saw this event while "standing in front of the ambulance building, which is directly across from the Borough building where the police department is." (*Id*.). On another occasion, Eastwood saw Semenza and Burdyn engaging in a "slow, passionate kiss, hands going up and down, again, above the clothes, below the clothes" while the two were "standing right out on the sidewalk right at the corner of the building." (*Id*. at 214).

According to Michelle Avvisato, who was the Mayor of the Borough of Old Forge from 2005 to 2014, her duty as Mayor was "to be in charge of the police department." (Dep. of Avvisato, at 20). She acknowledged that "the chief is in charge of the police department and [that she] oversee[s] the chief." (*Id*. at 30; *see also id*. at 58). Avvisato characterized being "in charge" as doing "the scheduling along with the chief" and that "if we needed an officer, a funeral, [she] would run that." (*Id*. at 21). Avvisato testified that she can only suspend a member of the police department and that the Borough council "does the hiring and firing." (*Id*.). Although Avvisato admitted that "the chief did most of the stuff", she stated that he "would come to [her] if there was a problem and then I would call the officer in. And if I felt I need to write him up, I would." (*Id*. at 25). If there were issues with the officers in the police department, the officer would come to Avvisato and then she would sit down with the chief of police. (*Id*. at 31). This would also include the circumstance where an officer raised an issue about the chief. (*Id*.). Avvisato stated that if the issue with the chief was severe, she would "write up the chief", and that she did in fact write Semenza up once for not wearing his uniform. (*Id*. at 32). Although "the Mayor may make or prescribe

9

the manner in which the chief and members of the police department shall perform their duties and, in doing so, may make such rules and regulations as [s]he shall deem advisable", Avvisato admitted that she did not personally make any rules or regulations for the police department. (Id. at 60-62). Despite Avvisato being "in charge", she stated that she "was down [at] the Borough building probably once a week." (Id. at 30).

Mayor Avvisato testified that she never saw or heard anything inappropriate between Plaintiff and Krenitsky or Chiavacci and never heard anyone from OFHE make reference to anything inappropriate. (Dep. of Avvisato, at 126).

Upon the arrests of Semenza and Krenitsky, the District Attorney contacted Avvisato, who contacted the city solicitor and appointed Officer Kimberly Buggey in charge of the police department. (Id. at 112-113).

## IV. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific

10

facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

11

*material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## V. ANALYSIS

Of the fourteen remaining counts in Plaintiff's Amended Complaint, only Count IV (Violation of 42 U.S.C. § 1983 for Failure to Promulgate Policies/Failure to Supervise/Failure to Train) remains pending against the Borough of Old Forge. Defendant argues that summary judgment is appropriate on Plaintiff's *Monell* claim "as there was no violation of a constitutional right of the Plaintiff and further there is no evidence of any relationship to the alleged violation with a custom, practice or policy of the Borough to substantiate [Burdyn's] claim against Old Forge." (Doc. 188, at 4).

To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate the violation of a right protected by the Constitution or laws of the United States, committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc). Section 1983 is not in itself a source of substantive rights, instead providing a remedy for violations of rights protected by other federal statutes or by the U.S. Constitution. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L. Ed.2d 791 (1985). Therefore, in evaluating a § 1983 claim, a Court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Nicini*, 212 F.3d at 806 (citing *Cnty. of*

12

*Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L. Ed. 1043 (1998)). As applied in a case such as the one currently before this Court, Plaintiff's claims against the Old Forge Borough arise under Plaintiff's Fourteenth Amendment right to be free from violations of her bodily integrity.

## A. Color of Law

The Borough of Old Forge first argues that Semenza and Krenitsky's conduct was not carried out "under color of state law" or performed within their capacity as law enforcement officers (Doc. 188, at 6-13).

State action is "a threshold issue in any section 1983 case." *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 23 (3d Cir. 1997). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)). Generally, employment by the state is sufficient to render a defendant a state actor. *West*, 487 U.S. at 49. Further, a "defendant acts under color of state law when he abuses the position given to him by the state." *Id.* at 49-50. In other words, "in the usual case we ask whether the State provided a mantle of authority that enhanced the power of the harm-causing individual actor." *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 193, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988).

Nonetheless, within the Third Circuit

[i]t is well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state. Rather, in order for the tortfeasor to be acting under color of state law, his act must entail "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."

*Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3d Cir. 1995) (quoting *Classic*, 313 U.S. at 326). Thus, "a state employee who pursues purely private motives and whose interaction with the victim is unconnected with his execution of official duties does not act under color of law." *Bonenberger*, 132 F.3d at 24. For example, "a police officer's purely private acts which are not furthered by any actual or purported state authority are not acts under color of state law." *Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3d Cir. 1994). A determination of whether a police officer acted under color of state law requires an examination of the facts and circumstances in their totality; the "state action question" therefore cannot "be limited to a single factual question." *Harvey v. Plains Twp. Police Dep't.*, 635 F.3d 606, 610-611 (3d Cir. 2011).

Defendant Old Forge Borough repeatedly argues that Semenza and Krenitsky's "interactions" with Plaintiff all took place in OFHE and were unrelated to their duties as police officers. (*See* Doc. 188, at 7, 8, 9, 13). With respect to the location of the "interactions", there is sufficient evidence to demonstrate a dispute of fact regarding whether Semenza and Burdyn engaged in acts of a sexual nature outside OFHE, including in the police department and in vehicles associated with the police department. There are also

material disputes of fact regarding other factors bearing on whether Semenza was acting under color of law. As for Krenitsky, although Plaintiff does not offer any evidence to contradict Defendant's allegation that Krenitsky's sexual relations with Burdyn took place anywhere other than in the firehouse, as discussed below, this does not preclude a finding that Krenitsky was acting under color of state law.

It is undisputed that as Chief of the Old Forge Borough Police Department, Semenza was a state employee. However, Burdyn's testimony both during her deposition and at Semenza's trial, as well as the testimony of several other individuals, create a factual issue for the trier of fact regarding whether Semenza engaged in acts within his capacity as a police officer or misused the power he possessed as a result of his position as Chief of Police in order to violate Plaintiff's bodily integrity.

First, despite the Borough of Old Forge's contention, Semenza and Burdyn's interactions were not limited to the firehouse and possibly occurred in the police station or police vehicles. Plaintiff testified she communicated with Semenza "multiple times on AIM [AOL Instant Messenger] and AOL" and that on occasion Semenza would tell her to come to the police station from the fire station. (Dep. of Burdyn, at 281). Burdyn also stated that she and Semenza would spend time together alone at the police station (Trial Tr., Oct. 16, 2013, at 72), later elaborating that "[y]ou couldn't come near me because I was with him all the time in his office and the police station at his desk with him all the time" (id. at 77). Other portions of Burdyn's testimony further support the possibility that she spent what a

15

jury might consider to be a significant amount of time in the police department (see e.g., id. at 265-266, 281, 312, 401-402; see also, Trial Tr., Oct. 16, 2013, at 70, 71, 119).

Burdyn testified to a specific incident at the police station wherein she went to the station on Halloween when she was 15 years old dressed in a costume. On that occasion, she alleges that she sat on Semenza's lap and that "he had his arms around me, touching my legs." (Dep. of Burdyn, at 401-402). This story is corroborated by several witnesses. Lowe testified at Semenza's trial that he saw Semenza pull Burdyn into his lap in the Police Department on Halloween of 2004 while Plaintiff was dressed in a "black costume, short skirt." (Trial Tr., Oct. 17, 2013, at 287) (see also, Pennsylvania State Police Incident Report, 5/4/12, Interview with William Robert Rosky, Jr., Doc. 202-7 (wherein Rosky, a part time police officer for the Old Forge Police Department stated that he remembered Burdyn coming to the police department on Halloween of 2004 or 2005, and that Semenza, while sitting in his chair, slapped his knee and told her to sit on his lap – after Burdyn did so, she put her arm around him and Semenza placed his arms around her waist.)).

During her trial testimony, Burdyn also recalled an incident in the weight room, "in the basement of the police and fire station", which was accessible to both police officers and firefighters. On this occasion, Semenza "kissed [her], he touched [her], he put his hands down [her] pants and proceeded to touch [her]. . . ." (Trial Tr., Oct. 16, 2013, at 115-116, 273). Whether Semenza was acting as a private citizen, in his capacity as Chief of Police, or as the Captain of the OFHE at that time is unclear.

16

Despite the incident in the police station at Halloween and in the weight room shared by the police and fire departments, Burdyn offered that in her opinion "[n]othing intimate happened in the Police Station" but admitted that "affectionate" acts occurred there such as "sit[ting] at this desk [in Semenza's office] or on the side of his desk, sit[ting] on the corner of the desk, spend[ing] a lot of time there. . . ." (Trial Tr. Oct. 17, 2013, at 6). Burdyn further testified at her deposition that Semenza made inappropriate comments in front of members of both the fire department and police department, including "references to me as having sex with him . . . [c]rude comments . . . [t]alking about my body . . . [t]alking about my chest. . . ." (Dep. of Burdyn, at 265). Burdyn additionally testified that Semenza "bragged about [supposedly having sex with Burdyn] to everybody at the police department and anybody around him on many occasions." (*Id*. at 266). Krenitsky also proffered that he saw Burdyn sitting on Semenza's lap one time in Semenza's office at the police department and that Semenza would make comments such as Burdyn's "ass looked nice in those shorts" and that she was a "good-looking girl" in front of other people. (Proffer of Krenitsky, at 30-31). Krenitsky also testified at Semenza's criminal trial that "there were a few times that [Burdyn] came in the police department and [Semenza] would be at his desk in his office and she would sit on his lap." (Trial Tr., Oct. 18, 2013, at 49).

Additionally, there is testimony that Burdyn was in Old Forge police vehicles on several occasions. Eastwood testified at Semenza's criminal trial that on one occasion she saw Semenza "pull[] in with the cruiser", seemingly a reference to a Borough of Old Forge

police car, at which time Burdyn sat on his lap and Eastwood "could see . . . his left hand up and down his back, first over the clothing, down the legs, up the back of the shirt and eventually underneath the shirt down the back of the pants." (Trial Tr., Oct. 18, 2013, at 209). Kim Buggey also recalled in her deposition that she saw Semenza and Burdyn in police cars together "a few times." (Dep. of Buggey, at 47).

The Borough of Old Forge fails to offer any explanation for why a junior firefighter, who admittedly had no affiliation with the Old Forge police department, would be permitted to spend time in the police department or its vehicles and no factual explanation for her presence there, unless it was to see Semenza or was at his request as argued by Plaintiff. Nor does the Borough offer any evidence to dispute Plaintiff's claim that Semenza made inappropriate sexual comments about her, her body, and having sexual intercourse with her while at the police department and in front of police officers.[7] A trier of fact must determine whether Semenza's ability to repeatedly make inappropriate comments about Burdyn and to have Burdyn with him "all the time" at the police department are the result of his position as Chief of Police. Further, there is sufficient evidence to create a factual dispute regarding what occurred at the police station and in police vehicles, including the nature of these "interactions", and whether Semenza was in uniform, on-duty, or off-duty during each of these occasions. It is for a trier of fact to determine whether the so-called displays of

---

[7] By virtue of Semenza's position as Chief of Police, any police officer who heard Semenza's comments about Burdyn were necessarily his subordinates, raising an issue with respect to whether Semenza was able to make such comments with impunity, and have Burdyn frequently visit him at the police department, in large part, or solely, due to his position within the department.

18

"affection" that occurred in the police department and the police vehicles between Burdyn and Semenza are encompassed within the alleged ongoing violation of Plaintiff's bodily integrity by Semenza, and was, at least in part, the result of Semenza's position in the Police Department.

Although factual differences exist between Semenza's interactions with Plaintiff and those of Krenitsky, an analysis of Defendant's argument that Krenitsky was not acting under color of state law yields the same finding. As captain of the Old Forge Borough Police Department, Krenitsky was a state employee. There is no evidence that Krenitsky was a member of the OFHE between 2004 and 2007, including during the undisputed time-frame during which he and Plaintiff engaged in sexual activities in 2005.[8] Therefore, unlike Semenza, Krenitsky's interactions with Plaintiff cannot be argued as having occurred by virtue of his position in the fire department. The fact that Krenitsky's sexual interactions with Burdyn only took place in the fire department and not in the police department does not somehow show that Krenitsky was necessarily not acting in his official capacity as a police officer during these incidents.

---

[8] The Court notes that Plaintiff disputes Old Forge Hose & Engine's statement of material fact in support of its motion for summary judgment that "[d]uring the time of their relationship, Krenitsky had no affiliation with OFHE". (Doc. 166, at ¶ 38; Doc. 170, at ¶ 38). However, Krenitsky testified that he had no affiliation with OFHE in 2004, that he did not ever have a professional relationship with the OFHE, and that although he was a "social member" of the OFHE for one year because he gave a $5 donation, this did not entitle him to participate in any events at the firehouse. (Dep. of Krenitsky, at 122-126, 158-159). Plaintiff points to no evidence to contradict this statement or create a dispute as to the veracity of the defendants' assertion.

In response to an Assistant District Attorney's question during Krenitsky's proffer how, if Krenitsky was "in the police department, how would you have met [Burdyn] if she's working in the fire department", Krenitsky replied that he knew Burdyn's step-father who worked for the Borough, but "I mean, becoming a member [of OFHE], you just got to know them." (Proffer of Krenitsky, at 12). He also stated that he did not get to know Burdyn prior to her becoming a junior firefighter. (Dep. of Krenitsky, at 22). Krenitsky explained that as Burdyn "progressed in the fire department" and after school got out for the year, "she might have started coming around more[,] and I was seeing her more", but that he never saw her outside of the borough building.[9] (Proffer of Krenitsky, at 14).

It is undisputed that the police department and OFHE share a building. It was Krenitsky's position as a police officer which provided him the opportunity to have contact with Burdyn, including: (1) allowing him, while on duty, to have the ability to see and interact with Burdyn "behind the police department", during which time they would plan to have intimate relations, (2) facilitating his ability to engage in sexual acts with her, and (3) to gain access to the fire department bunk room in order to engage in these acts.

Defendant also states that there is no evidence that Krentisky was on-duty during any of the times he engaged in sexual interactions with Burdyn. This is directly contradicted by the evidence. Krenitsky proffered that on the occasions that he was behind the Borough building smoking when he would talk with Burdyn and then go to the fire department to

---

[9] Krenitsky seemingly distinguishes between not seeing Burdyn in general "outside of the Borough building" and his admission that he would meet Burdyn "behind the police department." (*Compare* Proffer of Krenitsky, at 14 *with id.* at 15-16).

engage in oral sex with her, he was on duty and there were occasions he was in his uniform. (Proffer of Krenitsky, at 15-17). Burdyn also testified that "the first time [she and Krenitsky] went into [the bunk] room Jamie was in his uniform with a lighter blue shirt on and dark blue pants and gun belt. He was – I believe he was on duty. . . . he had taken his gun belt partially off and unzipped his pants. He did not take his other belt off other than undoing it . . . " (Tr. Prelim. Hr'g, June 27, 2012, at 12). Krenitsky admitted that, once in the bunk room, he would remove his duty belt and lower his pants, but did not completely remove his clothing. (Proffer of Krenitsky, at 17-18).

In viewing the totality of the facts and circumstances, there is an issue of fact regarding the coercive influence, if any, on Burdyn of Krenitsky having been in uniform at the time of at least some of his interactions with Plaintiff and armed with a police weapon, as well as whether the weapon was used by Krenitsky to demonstrate his influence or power.

Although Burdyn testified that Semenza and Krenitsky never threatened her, in response to a question regarding whether "any of them ever use[d] their position to coerce you into doing something you didn't want to do", she explained the following:

> I don't believe they used it against me or said it to me, but I would -- I believe personally that they had a position of power and -- excuse me, I had -- they had a position of power, and I believed in them and I trusted them. So why would I think something was wrong if the chief of police is okay with it or the captain of the police department or police officer or captain of the fire department for that matter.

(Dep. of Burdyn, at 261-262).[10] Further, Plaintiff expressed doubt that anyone would believe her if she did report the inappropriate activity to the police because Semenza was the chief of police. (*Id*. at 262). Plaintiff's statements also demonstrate that despite the Defendant Borough's efforts to distinguish Semenza's role as Chief of Police from his role as Captain of OFHE, Plaintiff does not make such a distinction and saw Semenza in both lights simultaneously, underlining the need for a jury to decide in what professional capacity, if any, Semenza was acting when he engaged in the alleged sexual misconduct.

Drawing all reasonable inferences in favor of the plaintiff, her testimony provides sufficient evidence to create a genuine dispute of material fact as to whether Semenza and Krentisky's positions in the police department, including their "position of power" and the trust she placed in each of them given their official positions, influenced Burdyn to engage in sexual acts with them, particularly given her age at the time of the events in question. After considering the totality of the facts and circumstances, whether Semenza and/or Krenitsky were acting under color of state law will be a question for the trier of fact.

Consequently, as Plaintiff properly points out (Doc. 203, at 8-9), a jury will be instructed to look at certain factors, including but not limited to the factual disputes regarding whether one or both of the officers were on duty during some or all of the time that each had

---

[10] *See also*, Trial Tr., Oct. 16, 2013, at 155 ("I went to a lawyer because the people who were supposed to protect me are the people who hurt me. You are supposed to go to the police when something bad happens. You are supposed to go to the fire department when you need help, and those are the people who hurt me, so what am I supposed to do, walk into their office and tell them, 'You hurt me'? Are they going to laugh at me? And am I going to walk into the D.A.'s office without somebody to stand beside me who trusts me and believes me and tell them what happened without worrying that they are not going to believe me, that this person is a cop and he can't hurt you?").

sexual contact with Burdyn, whether the officers were in uniform during the incidents, and

whether one or both of the officers used his official position to exert influence or physical

control over Burdyn, (see Model Civil Jury Instructions for District Courts of the Third Circuit,

4.4.2) and determine whether Krenitsky and/or Semenza was acting under color of state

law. Such a determination must be made prior to the jury being able to decide whether

Plaintiff's right to bodily integrity was violated by these defendants such that *Monell* liability

could even possibly attach.[11]

## B. *Monell* Liability

Plaintiff's Amended Complaint attempts to impose *Monell* liability on the Borough of

Old Forge through allegations that the Borough violated Plaintiff's civil rights pursuant to 42

U.S.C. § 1983, specifically by failing to promulgate policies, failing to supervise its police

officers, and failing to train the police officers (Count IV). (Doc. 179).

In its Memorandum Opinion granting in part and denying in part Defendant Old

Forge Borough's Motion to Dismiss the Court stated that:

> there remain only certain issues with respect to the Borough that must be
> addressed on summary judgment or at trial. As to the remaining issues,

---

[11] In *Aspen Specialty Insurance Company v. Old Forge Borough*, a related case, this Court adopted Magistrate Judge Martin Carlson's finding in a Report and Recommendation that Semenza and Krenitsky were acting outside the scope of their employment for purposes of coverage under the Borough of Old Forge's insurance policy. (*See* 3:13-cv-127, Docs. 35, 39). The Court's finding in *Aspen Insurance* that these individual defendants were not acting within the scope of their employment as police officers does not affect this Court's finding that there is a material issue of fact with respect to whether these defendants were acting under color of state law. *See Zion v. Nassan*, 283 F.R.D. 247, 267 (W.D. Pa. 2012) ("The actions of a state official may 'constitute state action for purposes of the Fourteenth Amendment' even when they exceed the limits of the official's authority. This court has already recognized that a police officer may sometimes act both 'under color of state law' and beyond the scope of his or her employment.") (quoting *Hichenbottom v. Nassan*, 2007 WL 7753803, at *43 (W.D. Pa. 2007) (internal citation omitted)).

Plaintiff is placed on notice that her attempts to impose *Monell* liability on the Old Forge Borough on the bases that the Borough failed to enact or implement policies and failed to train and supervise its police and members of the OFHE must be supported by evidence of record showing that there are material issues of fact for trial as to the existence of a causal relationship between Plaintiff's sexual assaults by, and other unlawful sexual contact with, the individual defendants in this case and the Borough's alleged failure to enact or implement policies and to train its employees and agents on the duty to refrain from sexual contact with a minor.

(Doc. 175, at 28-29).

A municipality may be held liable under § 1983 when the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers", including "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, "a municipality cannot be held liable *solely* because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

As the Third Circuit has observed:

There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for

24

whom the employee works, thereby rendering the entity liable under § 1983. The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Natale v. Camden Cnty Corr. Facility,* 318 F.3d 575, 584 (3d Cir. 2003) (internal citations

and quotation marks omitted).

A review of the record evidence as well as the briefs in support and opposition to

summary judgment reveal that the best-founded and most substantive of Plaintiff's claims is

based on the third situation referenced in *Natale.* That is, a claim that the Borough's failure

to enact, implement, or promulgate policies resulted in a violation of Plaintiff's Fourteenth

Amendment rights. As the Court previously stated, the Amended Complaint sufficiently

alleged:

> that the lack of polices, training, and supervision as to other aspects of Plaintiff's claim [other than the need for a policy or training prohibiting sexual assault and harassment of a minor] created circumstances under which the policymaker's actions or inaction could be found to have communicated a message of approval to the offending subordinate and could reasonably be said to demonstrate deliberate indifference. For example, Plaintiff alleges that the Borough "fail[ed] to have a policy in place for reporting improper and illegal conduct of supervising officers and/or other Police and/or Fire Department members", "fail[ed] to properly train, discipline, control or sanction firefighters for having naked photos of the minor Plaintiff", and "fail[ed] to supervise, oversee, monitor, control, curtail or restrain the actions of Semenza and Krenitsky when, upon information and belief, Old Forge

25

Borough knew from prior acts of misconduct by Semenza and Krenitsky, that there was an obvious likelihood that other individuals could suffer physical and psychological injury. . . . " (Doc. 125, ¶ 114(a)(vii), (b)(v), (c)(vi-vii)).

(Doc. 175, at 26-27). Plaintiff now additionally points to a variety of policies that she believes should have been in place to protect her constitutional rights, the most persuasive of which are "policies regarding disciplines [sic] for infractions . . . policies regarding the Mayor, as the final authority, and her availability to minors within the Borough. . . ," and "policies pertaining to the treatment of minors . . . and training of police officers in proper contact with minors." (Doc. 203, at 23-24). The Borough of Old Forge does not set forth any evidence, or even allege, that at all relevant times it had any policies relating to minors, including policies regarding the presence of minors in the Borough building including in the OFHE and/or police department, any policies or limitations with respect to whether and how Borough employees were to interact with minors, or policies regarding minors visiting the police department for personal reasons as opposed to police business. The Borough further offers no evidence of official policies regarding the reporting of suspected misconduct within the police department, including whether a policy exists for reporting misconduct of a superior officer. While Plaintiff acknowledges that "it is preposterous to have a policy or training program to prevent an officer from sexually abusing or harassing a minor", she submits that "it is just as preposterous to have absolutely no policies in place regarding minors in the Borough building." (Doc. 203, at 23).

The Court agrees that the complete lack of policies regarding minors in either the Police Department or the OFHE raises an issue of fact for a jury with respect to whether this absence caused the constitutional violation at issue. The absence of any rules or policies may lead to the highly predictable or obvious risk of harm to a minor and/or likely violation of that minor's constitutional rights. Whether the absence of any policies regarding minors could reasonably be said to create a situation wherein a violation of a minor's *bodily integrity* would result is a closer question, but equally one for a trier of fact to determine.

Furthermore, there is evidence on the record that the Old Forge Police Department was *de facto* run by Semenza. Mayor Avvisato's testimony reveals that despite being "in charge of the police department" and "oversee[ing] the chief" she did not personally make any rules or regulations for the police department and was only "down [at] the Borough building probably once a week." (Dep. of Avvisato, at 20, 30, 58, 60-62). According to Lowe, Semenza was a bully and pushed the Mayor around to get what he wanted. (Pennsylvania State Police Report, Doc. 202-9, at 1). Buggey similarly related that "the mayor [was] afraid of Larry [Semenza], she's useless." (Pennsylvania State Police, Second Interview with Old Forge Police Officer Kimberly Buggey, Doc. 202-22, at 4). Further, Buggey told the Pennsylvania State Police that part-time officers were afraid that if they fell out of favor with Semenza, he would cut their hours and that on occasion Semenza had threatened her with changing shifts. (*Id.* at 3). Rosky also told the Pennsylvania State Police that Semenza would do what he could to get officers he did not like fired, including

Rosky. (Pennsylvania State Police Incident Report, Interview with William Robert Rosky, Jr., Doc. 202-7, at 1).

Krenitsky described Semenza as a micromanager who ran a strict department, commenting that "if it was somebody that [Semenza] was friendly with, things needed to be done quicker than even what the law would allow." (Proffer of Krenitsky, at 38-39). Krenitsky further related that Semenza asked him to do a number of things that made him uncomfortable as an officer, including "fix[ing] an accident report that dealt with one of his friends to make it more favorable of an accident for his friend", and fixing traffic citations and DUIs.[12] (*Id.* at 39-40). Krenitsky also proffered that Semenza had asked Buggey to alter a report regarding "a domestic at his home" and that when Krenitsky asked Buggey about it, "she said that she was advised by the chief not to do a narrative." (*Id.* at 41).

This record evidence creates an issue of fact as to whether there was a custom or practice, albeit unofficial, that was known to, or created or acquiesced in by, Mayor Avvisato and the Borough council to allow Semenza, and those close to him such as Krenitsky, to do what they wanted without oversight or restraint and that any misconduct would not be reported and/or investigated. The record thus contains sufficient evidence that the final decision-makers and policymakers acquiesced in a well-settled custom of willfully turning a blind eye to the questionable actions of Semenza and his unrestricted control over members of the police department. Further, there is sufficient evidence to warrant trial as to whether

---

[12] Buggey also told the Pennsylvania State Police that Krenitsky would log traffic citations and they would sometimes never make it to the magistrate, supporting Krenitsky's account. (*See* Pennsylvania State Police, Second Interview with Old Forge Police Officer Kimberly Buggey, Doc. 202-22, at 4).

the custom of yielding to Semenza complete control over the Police Department and the presence of inadequate policies to control and monitor Semenza and his subordinates, despite obvious consequences that could arise as the result of such a custom, caused the plaintiff to suffer impermissible violations of her bodily integrity. The disputed existence of such a custom, despite the obvious risks that could arise from it, offers an alternate basis for the imposition of *Monell* liability on the Borough.

With respect to Plaintiff's claim that in addition to failing to enact or promulgate policies to protect minors, Plaintiff also alleges that the Borough failed to train and supervise its police officers. A municipality may also be liable if it failed to train or supervise municipal employees to avoid constitutional violations. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Nonetheless, "[w]here a plaintiff claims that the municipality has not directly inflicted an injury," but rather relies on the alternative basis that some failure to train on the part of the municipality caused an employee to inflict the injury, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty Com'rs of Bryan Cnty v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Any such failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact'" in order to "'be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (quoting *City of Canton*, 489 U.S. at 388-

89). This is the case because "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 1360. Therefore, an allegation that a municipality failed to adequately train, supervise, discipline, or control its employees will only form the basis for § 1983 municipal liability "if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone*, 159 F.3d 120, 127 (3d Cir. 1998); *see also Berg v. Cnty of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).

Even assuming, but without deciding, that Avvisato did not have actual notice of Semenza, Krenitsky, and/or Chiavacci's relationships with Plaintiff, Avvisato's own neglect of her duties as Mayor with respect to the police department arguably deprived her of such notice. A decision-maker or final policy maker cannot eliminate the imposition of liability on a state agency for which she is responsible by simply neglecting her duties or purposefully turning a blind eye to the actions of her subordinates in order to later assert that she was unaware of any misconduct. Allowing such behavior would only encourage decision-makers and final policy makers from properly performing their jobs and this inaction can both create the offending custom and amount to acquiescence in the policy or custom. *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1091 (3d Cir. 1991) (Sloviter, J., concurring

in judgment) ("The Supreme Court has not suggested that actual knowledge of the conditions by a municipal policymaker is a condition of municipal liability. Such a standard would put a premium on blinders. If Judge Becker's [majority opinion] emphasis on scienter is read to exclude liability for conditions that City officials should have known, it would be inconsistent with *City of Canton.*")). Thus, in light of the record evidence, it is for a trier of fact to decide if Mayor Avvisato's inaction rises to the level of deliberate indifference.

As a result, with respect to the plaintiff's attempts to impose liability under *Monell* on the additional basis of a failure by the Borough to train or supervise, the same disputes of fact detailed above show there is a genuine dispute for trial as to whether Mayor Avvisato was deliberately indifferent to the rights of the plaintiff insofar as Plaintiff, at all relevant times a minor, was the subject of sexual attention and conduct which allegedly violated her bodily integrity. Such a showing of deliberate indifference will, like Plaintiff's claims of liability premised on the Borough's failure to enact policies and regulations regarding the presence of minors in the Borough's police station, turn on whether the Borough, through its Mayor, knowingly acquiesced in Semenza's conduct in part of what may be shown at trial to be the complete abdication of responsibility of the law enforcement functions of the Borough's police force to Semenza.

The issues for the trier of fact are therefore (1) whether Defendants Semenza and Krenitsky were acting under color of state law when they violated Plaintiff's Fourteenth Amendment rights, (2) whether the Borough and its decision-makers failed to promulgate

policies which would have prevented police officers from abusing their positions of power and violating Plaintiff's constitutional rights, including by having more reporting mechanisms in place, policies limiting the types of interactions that could take place between minors and the police officers, the amount of time, if any, minors could spend in the police department, and limitations on when and why a minor could be present in the police department, (3) whether the Borough had a custom or practice in essence allowing Semenza to abuse and exceed his power, unsupervised and without fear of repercussion, and (4) if such a custom existed, it also resulted in a failure to train and/or supervise the police officers to such an extent as to amount to deliberate indifference.

## VI. Conclusion

For the foregoing reasons, the Court will deny the Old Forge Borough's Motion for Summary Judgment (Doc. 186). A separate Order follows.

Robert D. Mariani
United States District Judge