THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NASTASHA BURDYN       :
     :
     Plaintiff,      :
     v.      :    **3:12-CV-2236**
     :    **(JUDGE MARIANI)**
**OLD FORGE BOROUGH**, et al.      :
     :
     Defendants.      :

## MEMORANDUM OPINION

### I. INTRODUCTION

A seven day jury trial was held in the above-captioned action beginning January 30,
2017. At the conclusion of the trial, the jury returned a verdict in favor of Defendants Old
Forge Borough, Old Forge Hose & Engine Company ("OFHEC"), Lawrence Semenza, and
James Krenitsky and against Plaintiff Nastasha Burdyn, but also returned a verdict against
Defendant Walter Chiavacci and in favor of Plaintiff in the amount of $20,000.00.

Now before the Court is "Plaintiff's Motion for New Trial Pursuant to Federal Rule of
Civil Procedure 59" (Doc. 444). For the reasons set forth below, the Court will deny the
Plaintiff's motion in its entirety.

### II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because the factual background of this case is thoroughly familiar to all parties and
has been discussed at length by the Court before (see e.g., generally, Mem. Op. Denying
Old Forge Borough Mot. for Summ. J., Doc. 209; Mem. Op. Granting in Part and Denying in

Part OFHEC Mot. for Summ. J., Doc. 211), a detailed discussion of the facts of the case is unnecessary here. Briefly, for purposes relevant to the present motion, Plaintiff filed her complaint (Doc. 1) on November 9, 2012 and subsequently filed an amended complaint on December 3, 2014 (Doc. 125). Plaintiff's amended complaint named as Defendants Old Forge Borough, Old Forge Police Department, Old Forge Fire Department, Old Forge Hose & Engine Company, Lawrence Semenza, Walter Chiavacci, and James Krenitsky, and set forth 22 counts including violations of Plaintiff's rights under 42 U.S.C. § 1983 against the Old Forge Borough, Old Forge Police Department, Old Forge Fire Department, Semenza, and Krenitsky (Counts I-V); violation of the Child Abuse Victims' Rights Act, 18 U.S.C. § 2255(a), by Semenza, Krenitsky, and Chiavacci (Count VI); childhood sexual abuse and vicarious liability (Count VII), negligence (Count VIII), negligent supervision (Count IX), and premises liability (Count X) by OFHEC; negligence by Semenza and Krenitsky (Counts XI-XII); negligence per se by Semenza, Krenitsky, and Chiavacci (Counts XIII-XV); assault and battery by Semenza, Krenitsky, and Chiavacci (Counts XVI-XVIII); negligent infliction of emotional distress by Semenza, Krenitsky, and Chiavacci (Counts XIX-XXI); and punitive damages against the OFHEC, Semenza, Krenitsky, and Chiavacci (Count XXII).

Each Defendant, with the exception of Chiavacci[1] and the OFHEC, filed motions to dismiss. On July 1, 2015, the Court ruled on the motions, dismissing Defendants Old Forge

---

[1] Upon Plaintiff's request, the Clerk of Court entered default against Chiavacci on January 16, 2013 (Doc. 41). Plaintiff never moved for default judgment.

2

Fire Department and Old Forge Police Department, and dismissing Count V (42 U.S.C. §

1983 - violation of substantive due process (actions of person with final authority)), Count VI

(18 U.S.C. § 2255(a)), Counts XI and XII (negligence), Counts XIII and XIV (negligence per

se), and Counts XIX and XX (negligent infliction of emotional distress). (Docs. 176, 178).

The Court also ruled that Plaintiff could not proceed using a pseudonym and ordered

Plaintiff to re-file her amended complaint using her legal name. Plaintiff thereafter filed

another amended complaint on July 14, 2015 (Doc. 179) wherein the addition of her name,

Nastasha Burdyn, constituted the only change.

Defendants Old Forge Borough and OFHEC each filed a motion for summary

judgment. (Docs. 165, 186). In October 2016, the Court denied Old Forge Borough's

motion for summary judgment (Docs. 209, 210), and granted in part and denied in part

OFHEC's motion for summary judgment (Docs. 211, 212).

A jury trial was held from January 30, 2017 through February 7, 2017. After

deliberation, the jury found that neither Semenza nor Krenitsky were acting under color of

state law when the alleged conduct occurred, thereby finding in favor of Semenza,

Krenitsky, and Old Forge Borough on Plaintiff's 42 U.S.C. § 1983 claims. With respect to

Plaintiff's state law claims, the jury found that Semenza, Krenitsky, and Chiavacci had not

committed an assault against Burdyn, but that Krenitsky and Chiavacci did commit a battery

against Burdyn. However, the jury found that only Chiavacci's actions were a factual cause

of Burdyn's harm, thereby finding in favor of Krenitsky on Plaintiff's state law claims, but

3

against Chiavacci on the state law claims.  Finally, the jury found that OFHEC was not negligent and was not negligent in supervising Semenza.  (See Doc. 429).

The Court entered judgment on February 7, 2017 (Doc. 430) and Plaintiff thereafter filed the instant Rule 59 motion pursuant to the Federal Rules of Civil Procedure (Doc. 444).

## III. STANDARD OF REVIEW

A losing party may move for a new trial or to alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59.

"The court may, on motion, grant a new trial on all or some of the issues – and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ."  Fed. R. Civ. P. 59(a)(1)(A).  The Court may grant a new trial "purely on a question of law;" or to correct a previous ruling "on a matter that initially rested within the discretion of the court, e.g. evidentiary rulings or prejudicial statements made by counsel" or "because [the Court] believes the jury's decision is against the weight of the evidence", among other grounds.  Klein v. Hollings, 992 F.2d 1285, 1289-1290 (3d Cir. 1993) (internal citations omitted).  While the Court has wide discretion to order a new trial to correct rulings that initially rested in its discretion, it has relatively narrow discretion to overturn a verdict on the grounds that the verdict is against the weight of the evidence.  Id.  However, "[a] motion for a new trial should be granted where substantial errors occurred in admission or rejection of evidence."  Goodman v. Penn. Turnpike

4

*Comm'n*, 293 F.3d 655, 676 (3d Cir. 2002) (citing *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 180 (3d Cir. 2000)).

The Court may also alter or amend a judgment pursuant to Fed. R. Civ. P. 59(e), otherwise known as a motion for reconsideration. *See Keifer v. Reinhart Foodservices, LLC.*, 563 F.App'x 112, 114 (3d Cir. 2014). "A motion under Rule 59(e) is a 'device to relitigate the original issue' decided by the district court, and used to allege legal error." *United States v. Fiorelli*, 337 F.3d 282, 288 (3d Cir. 2003) (quoting *Smith v. Evans,* 853 F.2d 155, 158-159 (3d Cir. 1988)). A motion to alter or amend "must rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (internal quotation marks and brackets omitted); *see also, Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). However, "motions for reconsideration should not be used to put forward arguments which the movant . . . could have made but neglected to make before judgment." *United States v. Jasin*, 292 F.Supp.2d 670, 677 (E.D. Pa. 2003) (internal quotation marks and alterations omitted) (quoting *Reich v. Compton*, 834 F.Supp.2d 753, 755 (E.D. Pa. 1993) *rev'd in part and aff'd in part on other grounds*, 57 F.3d 270 (3d Cir. 1995)). Nor should they "be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant." *Donegan v. Livingston*, 877 F.Supp.2d 212, 226 (M.D. Pa. 2012) (quoting *Ogden v.*

*Keystone Residence*, 226 F.Supp.2d 588, 606 (M.D. Pa. 2002)). Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should only be granted sparingly. *Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F.Supp. 937, 943 (E.D. Pa. 1995) (citing *Rottmund v. Cont'l Assurance Co.*, 813 F.Supp. 1104, 1107 (E.D. Pa. 1992)).

## IV. ANALYSIS

Plaintiff's motion sets forth four principal assertions of error, each asserting a separate basis for the grant of a new trial, three of which relate to rulings made by the Court at trial, and one relating to this Court's memorandum opinion and order granting Old Forge Borough's motion to dismiss Count V of Plaintiff's Amended Complaint. (*See generally*, Doc. 444). The Court will address these arguments in turn.

### A. The "Money Ball Photo"

Plaintiff first argues that the "Court erred by permitting Defense counsel to improperly use, publish and admit into evidence a previously undisclosed photograph" at trial. (Doc. 450, at 6). Specifically, at issue is a color photograph of a golf ball upon which is written "Money" with three dollar signs ("$$$") below it. (*See* Doc. 450, at Ex. A). Next to the photograph is a typed comment from "barbietender05" stating "I found the money ball! Lol [laugh out loud]". (*Id.*). The Court will hereinafter refer to this document as the "money ball" photograph.

To fully evaluate Plaintiff's arguments, the background leading to the Court's decision to allow counsel for Defendant Semenza, Attorney Joseph Goldberg, to question

6

Burdyn regarding the photo at issue, and the events following this decision, must be set forth.

On January 31, 2017, Plaintiff's counsel called Plaintiff, Nastasha Burdyn, to the stand. That same day, following the conclusion of Plaintiff's direct examination, counsel for Old Forge Borough completed his cross-examination of Plaintiff and counsel for OFHEC began his cross-examination. The following day, prior to the jury being brought into Court and counsel for OFHEC re-commencing his cross-examination, the parties requested a conference with the Court to discuss an issue that had arisen the prior evening with respect to certain photographs that Attorney Goldberg had just provided to Plaintiff's counsel. As explained by Plaintiff's counsel during the conference:

> Last night, I received an email from Attorney Goldberg's associate or Attorney Goldberg referencing the few pictures that Your Honor has in its possession. I spoke with Mr. Goldberg this morning. It's my understanding that he would like to introduce these pictures on cross exam of my client, which is I'm sure happening soon.
>
> Clearly, I can't speak to my client, I've never seen these documents, so I think they're prejudicial. I don't know why they're being offered, I think there's authenticity issues, as well.

(Trial Tr., February 1, 2017, at 3). Of relevance here, one of the photographs at issue was the "money ball" photograph posted by Plaintiff on Instagram in October of 2013.

During the conference, Attorney Goldberg acknowledged that he had notified Plaintiff's counsel about the photographs the evening before and explained why he should be allowed to use the "money ball" photograph during his cross-examination of Burdyn:

7

So having told this jury that there may be several motives for this young lady to say and do what she has said and claims to have done, and having found that she did, indeed -- unless she comes in and says she's an avid golfer and she found this golf ball, okay -- I don't intend to talk about the fact that it was the weekend before [Semenza's] criminal trial, although, we all know that it was, I'm going to ask her whether or not this posting by her on October 12, 2013 was a reference to Larry Semenza and any of the incidents giving rise to this lawsuit. That is my intent, sir.

(*Id.* at 8).

After hearing argument by Plaintiff's counsel and Semenza's counsel, the Court found that the photograph was proper subject for impeachment and would be allowed for that purpose. (*Id.* at 9).

During Attorney Goldberg's cross-examination, he confirmed with Plaintiff that her user name was "barbietender05" and that her Instagram account was public. (Trial Tr., February 1, 2017, at 82-83). Attorney Goldberg then showed Burdyn the "money ball" photograph and confirmed that Burdyn had posted this picture on Instagram on October 12, 2013. (*Id.* at 83). Attorney Goldberg thereafter moved to publish the photograph and move it into evidence, to which there was no objection. (*Id.*).

Having confirmed that Plaintiff was the author of the "money ball" photograph on Instagram, and that this photograph was available to any member of the public to view, the entirety of Attorney Goldberg's cross-examination of Plaintiff with respect to the specific meaning of the "money ball" photograph was as follows:

**BY MR. GOLDBERG:**

**Q.** . . . Can we agree you're not a golfer?

8

**A.** Actually, I am.

**Q.** I see. But that wasn't the message that this was about, was it? You sent a message October 12, 2013 that says, "I found the money ball. LOL." Do you see that?

**A.** Yeah, I do.

**Q.** I want to take you back to October 12, 2013, that's a Saturday, it's a weekend. This publication that you posted on Instagram was about Larry Semenza and the incidents in this case, isn't that true?

**A.** Absolutely not. This was a funny picture that I found a ball and took a picture of. It had nothing to do with anybody.

**Q.** You found a random picture about a golf ball with Money on it and posted it on your Instagram account?

**A.** No, I'm holding it. If you look at the picture next to it in [exhibit] 169, there's my nails, and if you look at the picture that I'm holding the ball, my nail tip is right there, I'm holding it, I found it, I was laughing, it was a joke.

**Q.** And the timing of your posting of this was a joke, too, right?

**A.** I'm assuming – I'm not sure when, exactly, October 12, 2013 was. Looking at the picture, so it was around football time, and I'm a Cowboys fan. I'm not exactly sure the reason for it. It was several years ago, and it was funny. A lot of the pictures I posted were funny things or things I was doing. Instagram is not made for anything else.

**MR. GOLDBERG:** Those are all the questions I have, Your Honor. Thank you.

(Trial Tr., February 1, 2017, at 84-85).

Following Attorney Goldberg's cross-examination and the subsequent cross-

examination of Burdyn by counsel for Krenitsky, the Court briefly recessed. Following the

recess, Attorney Goldberg was permitted to briefly cross-examine Plaintiff about a different

9

photograph, unrelated to the "money ball photograph", which was then admitted into evidence. (*Id.* at 92). Immediately after Attorney Goldberg finished this cross-examination, Plaintiff's counsel began his redirect examination of his client. (*Id.* at 93). Plaintiff's counsel did not request a recess to speak with his client now that she was no longer on cross-examination and, despite the fact that the Court did not place any restrictions on counsel's redirect, Plaintiff's counsel was very brief and in no way attempted to address any photos or exhibits mentioned by any of Defendants' counsel, including the "money ball" photograph. (*See id.* at 93-94).

Plaintiff now asserts that the use of this "money ball" photograph by Semenza's counsel constituted unfair surprise, presented newly discovered evidence, was prejudicial and misleading, was not properly used for impeachment, and was the result of attorney misconduct by Attorney Goldberg.

Preliminarily, to the extent that Plaintiff is asserting that the Court erred in admitting the "money ball" photograph into evidence, the record reflects that at the time Semenza's counsel moved to have the photograph entered into evidence, Plaintiff's counsel never objected. At trial, Attorney Goldberg showed Burdyn the "money ball" photograph, confirmed that she was the author of the "money ball" post on Instagram, that she had posted this photograph on or about October 13, 2013, and that this photograph was available to any member of the public to view, and then moved to publish the photograph and offer it into evidence. At that time, the Court asked if there was any objection to this

request, to which Plaintiff's counsel responded "no objection, Your Honor." (Trial Tr.,

February 1, 2017, at 81-83).

"[I]t is clear that a party who fails to object to errors at trial waives the right to

complain about them following trial." *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998).

> Generally, a party is not entitled to receive a new trial for objections to evidence
> that he did not make at or prior to the initial trial, even if they may have been
> successful. *Wilson v. Vermont Castings, Inc.*, 170 F.3d 391, 395 (3d Cir. 1999)
> ("[Plaintiff] has failed to preserve this claim for appeal because [Plaintiff's]
> counsel did not object to Vermont Castings's cross-examination of Wilson or its
> closing argument."); . . . *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672,
> 681 (3d Cir. 1980) ("[A] party may not seek a new trial on the basis of objections
> to evidence not brought to the court's attention at the original trial." (Citing
> *Belmont Industries Inc. v. Bethlehem Steel Corp.*, 512 F.2d 434 (3d Cir. 1975)).

*Ashford v. Bartz*, 2010 WL 272009, at *4 (M.D.Pa. 2010). An exception to this waiver rule

exists "when 'counsel fail[s] to object to a fundamental and highly prejudicial error resulting

in a miscarriage of justice.'" *Wilson*, 170 F.3d at 395-396 (quoting *Fleck v. KDI Sylvan*

*Pools, Inc.*, 981 F.2d 107, 116 (3d Cir. 1992)).

Here, although Plaintiff's counsel objected at the conference to the use of the

"money ball" photograph for impeachment purposes, counsel never objected to the

admission of this document into evidence, an issue separate from whether the photograph

was a proper basis for impeachment. While the Court denied Plaintiff's request that

Attorney Goldberg be precluded from using the picture for purposes of impeachment, at that

time the Court did not rule whether the photograph could be published to the jury or was

admissible for purposes of being offered into evidence and sent to the jury. Rather, it was

11

not until Attorney Goldberg requested that he be permitted to publish the photograph and that the photograph be admitted into evidence, and Plaintiff's counsel stated "no objection", that the Court granted the request for its publication and admission. As a result of Plaintiff's counsel's specific statement that he had "no objection", counsel has now waived the issue of the "money ball" photograph's admission into evidence. Furthermore, Plaintiff has not set forth any reason why the admission of the photograph would constitute "a fundamental and highly prejudicial error resulting in a miscarriage of justice" such that this Court should find that an exception to counsel's waiver exists.[2]

Nonetheless, separate from the issue of the admission of the "money ball" photograph into evidence, Plaintiff's arguments in support of her assertion that the "money ball" photograph was "improperly use[d]" at trial ultimately fail.

Pursuant to Federal Rule of Civil Procedure 26, "a party must, without awaiting a discovery request, provide to the other parties . . . a copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, *unless the use would be solely for impeachment*." Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis added). In addition, Rule 26 requires a party to provide "an identification of each document or other exhibit . . . the party expects to offer [at trial] and

_____

[2] As the Court explains, *infra*, the use of the "money ball" photo was neither prejudicial nor misleading, thereby supporting this Court's finding that Plaintiff's counsel's failure to object is not subject to the limited exception to a waiver.

those it may offer if the need arises", except if that information will be used "solely for impeachment." Fed. R. Civ. P. 26(a)(3)(A)(iii). If a party fails to timely provide the information as required in Rule 26(a), "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

"Substantive evidence is that which is offered to establish the truth of a matter to be determined by the trier of fact. . . . Impeachment evidence, on the other hand, is that which is offered to discredit a witness to reduce the effectiveness of her testimony by bringing forth evidence which explains why the jury should not put faith in her or her testimony." *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 515, 517 (5th Cir. 1993) (citing John P. Frank, *Pretrial Conferences and Discovery – Disclosure or Surprise?*, 1965 Ins. Law J. 661, 664 (1965)) (internal quotation marks and brackets omitted).

The meaning of "solely for impeachment" contained within Rule 26(a) has been subject to differing interpretations by federal courts. As recently explained by the D.C. Circuit Court when analyzing the manner in which various Circuit Courts and District Courts have applied Rule 26, "[i]n applying Rule 26(a)'s impeachment exception, some courts have concluded that the impeachment exception is limited to evidence that has no potential utility other than impeachment." *Standley v. Edmonds-Leach*, 783 F.3d 1276, 1283 (D.C. Cir. 2015) (collecting cases). However, "the Seventh Circuit has also held that undisclosed evidence with both impeachment and substantive qualities may be presented at trial so long

as it is strictly used to impeach." *Id.* (citing *DeBiasio v. Ill. Cent. R.R.,* 52 F.3d 678, 686 (7th

Cir.1995); *Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 870 n. 13 (7th Cir. 2005)).

"Under either approach, the courts have focused on the word 'solely' and our sister circuits

have read that term strictly. *See* 8A CHARLES ALAN WRIGHT & ARTHUR R. MILLER,

FED. PRAC. & PROC. CIV. § 2053 n. 57 (3d ed. 2014) (collecting cases)." *Id.* As further

explained by the D.C. Circuit Court:

> The district court in *Hayes v. Cha,* 338 F.Supp.2d 470, 503-04 (D.N.J. 2004),
> summarized the competing considerations. On the one hand, the district court
> acknowledged that some circuits, such as the Seventh Circuit in *DeBiasio,* 52
> F.3d at 686, reject the proposition that "solely" means that the evidence can
> have no substantive non-impeachment value. *Hayes,* 338 F.Supp.2d at 503.
> Those courts reason that evidence used to attack a witness's credibility often
> contains some substantive element, and reading Rule 26(a)'s "solely for
> impeachment" exception to bar use of such evidence if not earlier disclosed
> could "result in an erosion of evidence capable of warranting the impeachment
> designation." *Id.* (quotation omitted). On the other hand, the district court
> recognized that such an approach "strikes at the heart of the amended rules'
> broad intent" in favor of disclosure. *Id.* "Automatic disclosure was adopted to
> end two evils that had threatened civil litigation: expensive and time-consuming
> pretrial discovery techniques and trial-by-ambush." *Id.* (citing Advisory
> Committee Note on 1993 Amendments to subdivision (a) of Rule 26). A too
> expansive reading of the impeachment exception "could cause a resurgence
> of these evils." *Id.*

*Standley,* 783 F.3d at 1283-1284.

Although the Court in *Hayes* explained that "[a] too expansive reading of the

impeachment exclusion in 26(a) could cause a resurgence of these evils", it tempered this

conclusion by further explaining that "[a] too narrow reading could encroach on an attorney's

trial preparation, another important element of the civil system." *Hayes,* 338 F.Supp.2d at

503-504 (citing *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). As a result of these considerations, the *Hayes* Court set forth the following balancing test:

> A more balanced reading of the exclusion would take into consideration fairness factors akin to those noted in the *Konstantopoulos* [*v. Westvaco Corp.,* 112 F.3d 710 (3d Cir. 1997)] case, namely (1) the prejudice or surprise in fact of the party against whom the information was offered, (2) the ability of that party to cure the prejudice, and (3) the bad faith or wilfulness in withholding the information.

*Id.* at 504.

Here, the arguments set forth by Plaintiff, *i.e.* that the use of the "money ball" photograph by Semenza's counsel constituted unfair surprise, presented newly discovered evidence, was prejudicial and misleading, was not properly used for impeachment, and was the result of attorney misconduct by Attorney Goldberg, require consideration of the factors set forth by the Court in *Hayes.*

Plaintiff first argues that she was unfairly surprised because "the money ball photo was not timely presented to Plaintiff's counsel in advance of trial, but rather on the very morning Attorney Goldberg sought to question their client about it" and because "Attorney Goldberg voiced his desire to use the photo at the one and only time in the trial in which Plaintiff's counsel were explicitly prohibited from communicating with their client." (Doc. 450, at 7-8).

In support of this argument, Plaintiff relies on Federal Rules of Civil Procedure 26 and 37.[3] (*Id.* at 7). However, Plaintiff entirely ignores Rule 26's specific exclusion of impeachment evidence from the pretrial disclosure requirements. As discussed *supra*, the "money ball" photograph need not have been disclosed if it was being offered by counsel solely for impeachment purposes. *See* Fed. R. Civ. P. 26(a)(3), 26(a)(1)(A).

Although it is undisputed that the "money ball" photograph was not disclosed until after trial had commenced, and therefore well-after the time for the exchange of discovery had passed, Plaintiff's brief in support of her motion does not contend that Defendant attempted to use the photograph as substantive evidence, nor has she offered any explanation for why the photograph does not consist of proper impeachment evidence.

Here, Attorney Goldberg offered the "money ball" photograph in an attempt to challenge Plaintiff's credibility, both by placing Burdyn's motives for bringing this lawsuit into question and demonstrate any bias which may have influenced her testimony. Of note, although the allegations at issue all involved events from 2004 to 2007, the jury was aware that Plaintiff did not come forward until 2012, which Plaintiff explained during her direct examination was because "I didn't feel anything was wrong. I didn't feel like anything wrong had happened, and I didn't want to talk about it, either way." (Trial Tr., January 31, 2017, at 219-220). Burdyn thereafter testified that she first approached a civil attorney, not any law

---

[3] Plaintiff's brief in support of her motion cites to "Federal Rules of Evidence" 26 and 37 (*see* Doc. 450, at 7) although it is clear that Plaintiff intended to cite to the Federal Rules of Civil Procedure.

enforcement official, and that a friend "brought [her] to meet with [her attorneys]." (*Id.* at 220).[4] Earlier on the second day of trial, Plaintiff had called as a witness Stephen Lowe, a former police officer for the Borough of Old Forge from 2003 to 2008 (*id.* at 95). Lowe testified that when Burdyn first told him about Semenza, Krenitsky, and Chiavacci, in 2011, he told her they "could talk to an attorney" and that he referred her to a civil attorney who "wasn't interested in taking the case" and who he later admitted he knew did not practice criminal law. (*Id.* at 103-104, 111).[5] Plaintiff's testimony that she "didn't feel like anything wrong had happened", the testimony that she did not speak to any lawyer prior to 2011, and that she first approached civil attorneys, rather than any law enforcement officer, prosecutor, or other criminal lawyer, all raised a question with respect to Plaintiff's motives for bringing the lawsuit, and specifically whether it was for financial gain.

Furthermore, throughout cross-examination, counsel for other Defendants similarly attempted to place Plaintiff's credibility at issue with respect to any financial motives that she may have had in filing the present lawsuit. For example, prior to Attorney Goldberg's cross-examination, in response to questions posed by counsel for Old Forge Borough, Plaintiff confirmed that she had met with another civil lawyer prior to hiring her current civil

---

[4] Although Plaintiff explained that she first saw a civil attorney because she "didn't know the difference between civil and criminal" (Trial Tr., January 31, 2017, at 220), this explanation presented a credibility issue for the jury to assess.

[5] Once again, although Lowe provided an explanation for why he did not approach any law enforcement officer, prosecutor, or other criminal lawyer in 2011 upon learning of Burdyn's allegations, the veracity of this explanation was for the jury to assess.

counsel, and later admitted that the first time she saw a psychiatrist for "anything relating to these events [at issue in the lawsuit and the death of her stepfather]" was after she saw the attorneys she hired in the present civil lawsuit. (Trial Tr., January 31, 2017, at 227, 243).

Attorney Goldberg's use of the "money ball" photograph was offered to discredit Burdyn to reduce the effectiveness of her testimony by bringing forth evidence which attempted to explain why the jury should not put faith in her or her testimony, *see Chiasson*, 988 F.2d at 517. The use of the photograph was one of a number of attempts to impeach Plaintiff by several of Defendants' counsel by employing an often-used impeachment tactic in civil trials, to wit, attempting to convince the jury that the plaintiff has ulterior motives for bringing the lawsuit such as financial gain. It is unclear how Plaintiff believes that an attempt by one or more defendants to convince the jury that a plaintiff is not telling the truth in order to obtain money is not a classic example of impeachment. The photograph was not used by Defendant's counsel to attempt to establish the truth of a matter to be determined by the trier of fact or any element of Semenza's (or any other Defendants') substantive defenses, and Plaintiff has not asserted otherwise.

It is clear that Rule 26 was designed, in part, to eliminate the element of "surprise" in civil litigation. *See Becton Dickinson and Co. v. Tyco Healthcare Gp. LP*, 2006 WL 890995, at *10 (D. Del. 2006). As such, "[s]urprise during trial, by major variance in theory of recovery or defense, undisclosed until after the trial is underway, is a long-established ground for granting a new trial motion." *Sanford v. Crittenden Memorial Hosp.*, 141 F.3d 882, 886 (8th

18

Cir. 1998) (citing *Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 286-288 (1st Cir. 1993); *Twigg v. Norton Co.*, 894 F.2d 672, 674-675 (4th Cir. 1990); *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 112 (5th Cir. 1982)).[6] *Cf. Kapelanski v. Johnson*, 390 F.3d 525, 535 (7th Cir. 2004) (where Defendant was on notice that the trial was about his alleged fraud, finding no unfair surprise where Plaintiff introduced a new theory of how the fraud occurred). However, "surprise does not always warrant the granting of a new trial. Courts will grant a new trial on the basis of 'surprise' only when it deprives the movant of a fair hearing. Thus, a movant must show reasonably genuine surprise, that is inconsistent with substantial justice, and resulted in actual prejudice." *Becton*, 2006 WL 890995, at *10 (internal citations, quotation marks, and brackets omitted). *See also*, *Twigg*, 894 F.2d at 674-675; *Genmoora Corp. v. Moore Bus. Forms, Inc.*, 939 F.2d 1149, 1156 (5th Cir. 1991); *Brady v. Chem. Constr. Corp.*, 740 F.2d 195, 200 (2d Cir. 1984).

---

[6] In support of her position that "it is well-established that 'unfair surprise' constitutes legitimate grounds for ordering a new trial" (Doc. 450, at 7), Plaintiff cites to two cases: *Genmoora Corporation v. Moore Business Forms, Inc.*, 939 F.2d 1149 (5th Cir. 1991) and *Conway v. Chemical Leaman Tank Lines, Inc.*, 687 F.2d 108, 112 (5th Cir. 1982). Pursuant to *Genmoora*:

A new trial may be ordered when the testimony of an expert witness, who has not been identified prior to trial, results in prejudicial surprise "inconsistent with substantial justice." *Conway v. Chemical Leaman Tank Lines, Inc.*, 687 F.2d 108, 111-12 (5th Cir. 1982). We have "limited reversible error from unfair surprise," however, "to situations where a completely new issue is suddenly raised or a previously unidentified expert witness is suddenly called to testify." *Id.* at 112. [Defendant] fails to meet this stringent test.

939 F.2d at 1156. Although Plaintiff correctly cites *Genmoora Corporation* and *Conway* for the proposition that unfair surprise may form the basis for a new trial, her reliance on these cases is unavailing where the Fifth Circuit has made clear that the party moving for a new trial on the basis of unfair surprise must meet a "stringent test" to establish that the surprise was both prejudicial and "inconsistent with substantial justice." Plaintiff has not set forth any explanation for how the "money ball" photograph constitutes "a completely new issue" or how the use of the photograph at trial was inconsistent with substantial justice.

Here, it cannot be said that the "money ball" photograph introduced any new theory or defense of which Plaintiff was unaware. As explained, the "money ball" photograph was used solely for impeachment purposes, and Plaintiff has not argued that the photograph was offered as substantive evidence or that its use at trial introduced an unknown theory or defense. For a defendant to argue at trial in a civil action that a plaintiff's decision to bring a lawsuit is, at least in part, the result of a desire for money and that the plaintiff's trial testimony should be evaluated in light of financial considerations is a common, if not uniform, trial practice. Indeed, the payment of money is the accepted, and expected, form of compensation in almost any civil lawsuit, a fact of which counsel strive to ensure the jury is aware. Although Plaintiff may have been surprised by Defendant's use of the photograph, Plaintiff has failed to establish that the use of this photograph was inconsistent with substantial justice or resulted in any actual prejudice to Plaintiff, thus failing to meet the "stringent test" set forth by numerous courts.

Finally, it bears noting that the "money ball" photograph was not a document of which Plaintiff had no knowledge or familiarity. Burdyn herself took the photograph and posted it on both Instagram and (as now asserted in Plaintiff's current motion) on Facebook. Although Plaintiff's counsel may have been surprised by the *use* of this document at trial, it is undisputed that Plaintiff herself was familiar with this photograph and had posted it at least twice on social media websites.

For these reasons, the Court finds that the "money ball" photograph was used "solely for impeachment" and Semenza's counsel did not have a duty under Rule 26 to disclose the photograph to Plaintiff prior to the commencement of trial. Nor did the photograph constitute "unfair surprise" such that Plaintiff is entitled to a new trial on that basis. Plaintiff's reliance on Rule 26 as a basis for this Court to find that she was "unfairly surprised" because the photograph was not disclosed at an earlier time thus fails.

Next, although Plaintiff argues that the "money ball" photo was not properly used for impeachment, the basis for this reasoning is unclear. Plaintiff asserts that a review of Attorney Goldberg's cross-examination of Burdyn with respect to the "money ball" photograph renders three things "abundantly clear":

> 1) use of the money ball photo was permitted solely for impeachment purposes; 2) Attorney Goldberg agreed to limit his use of the photo accordingly; and 3) Plaintiff not only confirmed that she was, in fact, a golfer, but adamantly denied that the photo had anything to do with Semenza or the incidents in question. Nevertheless, use of the photo continued long after Plaintiff had been unsuccessfully impeached with it. In fact, it was inexplicably admitted into evidence, and the phrase "money ball" soon grew into a rallying cry of sorts for the entire Defense, the implication being that Plaintiff was merely out to cash in on what were false allegations.

(Doc. 450, at 12).[7] These assertions are largely without any factual or evidentiary support in the trial record.

---

[7] For the reasons discussed *supra*, Plaintiff's assertion that the photo was "inexplicably admitted into evidence" is plainly without merit in light of Plaintiff's counsel's clear statement that he had "no objection" to its publication and admission into evidence. The Court will not re-address that issue here.

As demonstrated in the quoted portion of Attorney Goldberg's cross-examination of Plaintiff, *supra*, while Plaintiff asserts that the "use of the photo continued long after Plaintiff had been unsuccessfully impeached with it", the record reflects that Attorney Goldberg, after having established a foundation for the authenticity of the "money ball" photograph, engaged in cross-examination of Plaintiff with respect to the relationship of the photograph to this action only briefly, asking only five questions. During this cross-examination, Plaintiff testified that she was a golfer, posted the photograph because it "was a funny picture", and that while she was "not exactly sure the reasons for it", that it was unrelated to Semenza and the incidents in this case. Attorney Goldberg then ceased his cross-examination. After this questioning, the "money ball" photograph was only briefly referenced several times during the evidentiary portion of the trial, and twice during closing arguments – once by Attorney Goldberg, and once by Plaintiff's counsel.[8] Plaintiff's claim that the "phrase 'money

---

[8] For example, during Attorney Goldberg's cross-examination of Defendant Krenitsky, the following exchange took place:

Q. Were you in Court this morning when Ms. Burdyn was asked about something on Instagram that she published October 12, 2013, where she said, I found the money ball?
A. I was.
Q. How much time elapsed, between your guilty plea of September 12, 2013 and the October 12, 2013 publication?
A. Seems to be about one month.

(Trial Tr., February 1, 2017, at 192). Later that same day, Attorney Goldberg asked Plaintiff's mother Kyra Czachor whether her daughter "express[ed] any interest in golf" in 2013, to which she replied in the affirmative. (*Id.* at 246). Two days later, counsel for OFHEC referenced the "money ball" photograph when asking Plaintiff's expert Dr. Ann Burgess if she was aware whether "Ms. Burdyn had posted anything on her electronic sites that would indicate that secondary gain was an issue?" (Trial Tr., February 3, 2017, at 84). In response to this question, and Burgess's response in the negative thereto, on re-direct, Plaintiff's counsel, referencing the "money ball" photograph, elicited testimony from Dr. Burgess that "[money] would

ball' soon grew into a rallying cry of sorts for the entire Defense" is unsupported rhetoric that sharply departs from the actual events at trial. Although there is no doubt that counsel for the defendants each attempted to place Plaintiff's credibility at issue by suggesting that she may be biased as a result of the possibility of obtaining money if she was successful in this lawsuit, the "money ball" photograph was no more than a piece of a larger effort to discredit Burdyn.

Attorney Goldberg's cross-examination with respect to the "money ball" photograph, and the subsequent passing references to that photograph, fail to convince this Court that there is any evidentiary basis to support Plaintiff's claims that the "use of the photo continued long after Plaintiff had been unsuccessfully impeached with it", that the "phrase 'money ball' soon grew into a rallying cry of sorts for the entire Defense", or that Plaintiff was unfairly harmed or prejudiced as a result of the limited use of this photograph.

Finally, Plaintiff never objected on any basis during Attorney Goldberg's cross-examination of Plaintiff about the "money ball" photograph. As such, to the extent that Plaintiff now argues that Attorney Goldberg did not use the photograph for impeachment while cross-examining Plaintiff, this claim has not been preserved and Plaintiff has waived the issue. *See e.g., Wilson*, 170 F.3d at 395 (where Plaintiff claimed that during her cross-examination Defendant's counsel improperly asked questions which implied that she was

___

never be the primary driver." (*Id.* at 95). These afore-listed brief references to the "money ball" photograph appear to be the only times this photograph was referred to during the evidentiary portion of the trial.

 During the parties' closing statements, the "money ball" photograph was referenced twice, first by Attorney Goldberg and then by Plaintiff's counsel during his rebuttal statement.

negligent, Plaintiff "failed to preserve this claim for appeal because [Plaintiff's] counsel did not object to [Defendant's] cross-examination of [Plaintiff]. . . .").

For the aforementioned reasons, Plaintiff's argument that the "money ball" photograph was "not used for impeachment" (Doc. 450, at 9) is without merit.

In further support of her assertion that the Court "erred by permitting Defense counsel to publish, and improperly use" the "money ball" photograph, Plaintiff argues that the photograph was "prejudicial and misleading" in violation of Federal Rule of Evidence 403. Plaintiff only dedicates one paragraph to support this assertion of prejudice, arguing that "Defense counsel was, in effect, permitted to represent to the jury that something as innocent as a photo of a novelty golf ball taken at a golf course more than three (3) years ago somehow constituted definitive 'proof' that Plaintiff had levied false claims of sexual assault against the three (3) individual Defendants in the hopes of scoring a big payday." (Doc. 450, at 9).

Despite Plaintiff's brief argument, the probative value of the impeachment evidence, i.e. the "money ball" photograph, was not substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury.

Under the Federal Rules of Evidence, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. Irrelevant evidence is not admissible and relevant evidence is admissible unless otherwise provided by the

Constitution, federal statute, Federal Rules of Evidence, or other rules prescribed by the Supreme Court. Fed. R. Evid. 402. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

The Rule 403 balancing between the probative value of the evidence sought to be excluded and the prejudicial effect if the evidence is admitted, is "at its core, an essentially discretionary one that gives the trial court significant latitude to exclude evidence." *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 156 (3d Cir. 2002). *See also, McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009) ("A trial court is afforded substantial discretion when striking a Rule 403 balance with respect to proffered evidence.") (internal citation and quotation marks omitted). As such, to show an abuse of discretion, the party asserting error "must show the district court's action was arbitrary, fanciful or clearly unreasonable", and the trial court's exercise of discretion will not be disturbed "unless no reasonable person would adopt the district court's view." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002) (internal citations and quotation marks omitted); *see also, Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 188 (3d Cir. 1990) ("[A] trial judge's decision to admit or exclude evidence under Fed. R. Evid. 403 may not be reversed unless it is arbitrary and irrational.") (internal citation and quotation marks omitted).[9]

---

[9] As the Supreme Court explained:

Here, during the conference with counsel on February 1, 2017 to address the "money ball" photograph, the Court suggested that this photograph was relevant to the extent that it went to Plaintiff's motive, and explained that Attorney Goldberg should be allowed to inquire into the meaning of the photograph and if Burdyn "has an explanation that, in no way, suggests an interest in acquiring money, in connection with any matter, and she presents it, it may very well be that Mr. Goldberg, at that point, is concluded." (Trial Tr., February 1, 2017, at 9). In assessing the prejudicial effect of the evidence, the Court noted to Plaintiff's counsel that "everything that your opponent offers against you is prejudicial, otherwise, the case wouldn't be a case, but it has to be unfairly prejudicial" and requested that Plaintiff's counsel explain why he believed this evidence was unfairly prejudicial. (*Id.* at 8). Neither during this conference, nor in Plaintiff's brief in support of the present motion, has Plaintiff offered any substantive argument for why this photograph was *unfairly* prejudicial. Although the photograph may have affected the trier of fact's assessment of

---

In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings. This Court has acknowledged:

"A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403...." *United States v. Abel,* 469 U.S. 45, 54, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984).

This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant." 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, p. 4-16 (3d ed. 1999).

*Sprint/United Mgmt Co. v. Mendelsohn,* 552 U.S. 379, 384, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008).

Plaintiff's credibility, thereby lessening the impact of her testimony, this does not constitute *unfair* prejudice. In October of 2013, Plaintiff had a civil suit pending against a number of defendants, including Krenitsky who had pleaded guilty just one month prior to the "money ball" photograph being posted on Instagram (*see e.g.*, Trial Tr., February 1, 2017, at 192). In addition, the photograph at issue had relevance for impeachment purposes because it contained the cryptic caption that "I found the money ball! Lol".

A Rule 403 balancing analysis thus demonstrates that the Court did not abuse its discretion where the photograph's relevance in placing Burdyn's credibility and motives at issue was not substantially outweighed by a danger of unfair prejudice to the plaintiff.

Furthermore, although Plaintiff characterizes the photograph as "innocent" and argues that Semenza's counsel was permitted to represent the photograph as "definitive 'proof' that Plaintiff had levied false claims" against the three individual Defendants, these assertions simply represent Plaintiff's counsel's opinion as to the meaning of the "money ball" photograph. The jury was presented with Burdyn's testimony with respect to the meaning and origins of the photograph and were free to believe or disbelieve Burdyn's explanation that she provided on cross-examination. Nor is it clear why Plaintiff believes that this photograph was somehow accepted by the jury as "definitive" proof that all of

Plaintiff's claims were false, particularly when the jury found that Krenitsky and Chiavacci had each committed battery against Burdyn.[10]

For the aforementioned reasons, Plaintiff's argument that the "money ball" photograph was "prejudicial and misleading" in violation of Federal Rule of Evidence 403 fails.

Aside from the other issues addressed with respect to the "money ball" photograph, Plaintiff also asserts that following Burdyn's testimony, "Plaintiff's counsel discovered that Plaintiff had simultaneously posted the exact same photo on her Facebook page as well," but that the photo on Facebook "clearly demonstrates that it was taken by Plaintiff at a golf course while she and a friend were golfing." (Doc. 450, at 8). As a result, Plaintiff contends that had this information "come to light earlier (and Plaintiff's counsel maintains it surely would have had they been given adequate time to research the photo's origins and/or discuss it with their client)[, it] would have clearly and demonstrably refuted Defense counsel's assertion that the 'money ball' in the photo was not about golf, but rather constituted a veiled declaration of Plaintiff's intent to profit financially from the civil claims she intended to file against the Defendants in this matter." (Id.).

The standard for granting a new trial on the basis of newly discovered evidence "requires that the new evidence (1) be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence and (3)

---

[10] Although the jury found that Krenitsky committed a battery against Burdyn, they found that his acts were not the factual cause in bringing about harm to her. (Doc. 429, at 5-6).

28

would probably have changed the outcome of the trial." *Compass Tech., Inc. v. Tseng Labs., Inc.*, 71 F.3d 1125, 1130 (3d Cir. 1995) (explaining that Rule 59 and Rule 60(b)(2) share the same standard for granting relief on the basis of newly discovered evidence) (citing *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991)). A party moving for a new trial on the basis of newly discovered evidence "bears a heavy burden[] which requires more than a showing of the potential significance of the new evidence." *Bohus*, 950 F.2d at 930 (internal quotation marks and citations omitted).

With respect to the first element, the Facebook photograph/post is cumulative of the Instagram photograph. The Facebook photograph at issue is the exact same photograph posted on Instagram, contains the same quote posted on the Instagram page, "I found the money ball! Lmao"[11], and is dated October 12, 2013. (*See* Doc. 450-2). The only difference between the Instagram photograph/post and the photograph/post on Facebook is that the Facebook post includes the following notation: "Nastasha Elena Burdyn with Stephen Lowe at Pine Hills Country Club". (*Id.*).[12] Thus, the only additional information that this Facebook post offers is that it places Burdyn at a country club at the time the "money ball" photograph was posted. Although Plaintiff asserts that the Facebook photograph would have "clearly

---

[11] The "money ball" photograph posted on Instagram contained the caption "I found the money ball! Lol [laughing out loud]". The Facebook photograph contained the caption "I found the money ball! Lmao [laughing my ass off]." The terms "Lol" and "Lmao" are indistinguishable for purposes of this analysis.

[12] In addition to the Facebook post containing the "money ball" photograph, Plaintiff also includes a Facebook post showing that Burdyn was at Pine Hills Country Club on October 12, 2013 where she made "3 best drives." (Doc. 450-2). This post adds nothing to this Court's analysis where the Facebook "money ball" photograph already demonstrates that Plaintiff was at this country club on that day.

and demonstrably refuted Defense counsel's assertion that the 'money ball' in the photo was not about golf", this reasoning is unsound. Plaintiff testified on cross-examination that she was a golfer, had found the ball, and was holding it while she took a picture of it. (See Trial Tr., February 1, 2017, at 84). Plaintiff's mother confirmed that Plaintiff was interested in golf in 2013, when the photograph was posted. Even if Plaintiff had introduced evidence that the photograph was taken at a golf course by Plaintiff while she was golfing, regardless of Plaintiff's location, it does not preclude the possibility that the photograph was a reference to the lawsuit or the events surrounding the lawsuit. This is particularly so where as previously noted, the jury was aware that, in October of 2013, Plaintiff had a civil suit pending against a number of defendants, including Krenitsky who had just pleaded guilty one month prior to the "money ball" post.

It further cannot be disputed that the Facebook photograph could have been discovered before trial through the exercise of reasonable diligence. This photograph was posted on both Instagram and Facebook by Plaintiff herself in 2013. In light of Plaintiff's assertion in another portion of her brief in support of this motion that "all other references [except the "money ball" photograph on Instagram] to Plaintiff's presence on social media throughout the entire course of these proceedings pertained to her Facebook page" (Doc. 450, at 13), it is apparent that Plaintiff's counsel were not unaware of Plaintiff's Facebook page or unable to access its contents, whether by themselves or through Plaintiff. Nonetheless, even affording Plaintiff every benefit and taking as true that counsel was

unaware that the Instagram photograph would be used on cross-examination, and therefore assuming that Plaintiff's counsel had no reason to search for this photograph on Facebook or other social media site, Plaintiff's counsel had ample time to discover the Facebook photograph during the course of the trial and to discuss the Instagram photograph and Facebook photograph with their client. Attorney Goldberg's cross-examination of Burdyn wherein he first referred to the "money ball" photograph, occurred on Wednesday, February 1, 2017, during Plaintiff's case-in-chief. At the conclusion of Defendants' cases, on Monday, February 6, 2017, the Court asked Plaintiff's counsel whether they "have any rebuttal evidence", to which Plaintiff's counsel responded "[w]e do not, Your Honor." (*See* Trial Tr., February 6, 2017, at 62). By that time, Plaintiff's counsel had sufficient time to "research the photo's origins and/or discuss it with their client" and could have called Burdyn on rebuttal to attempt to further explain the photograph at issue and introduce the photograph on Facebook that Plaintiff now asserts proves the Instagram "money ball" photograph was only about golf, and not the lawsuit.[13]

---

[13] In Defendant Semenza's Brief in Opposition to Plaintiff's Motion for a New Trial, he properly notes that "[o]nce the Defense rested, Plaintiff's counsel could have retrieved Plaintiff's posting from Facebook and offered it to explain the timing of the photograph but elected not to." (Doc. 454, at 9). In response to this argument, Plaintiff's Reply brief merely asserts that "the proverbial cat was out of the bag as the jury had heard *ad nauseam* about the 'money ball.'" (Doc. 456, at 10). Not only is Plaintiff's characterization of any discussion of the photograph as "*ad nauseam*" highly questionable in light of its passing reference only three times prior to Plaintiff's opportunity to present rebuttal, Plaintiff's assertion illustrates that the decision not to address the "money ball" photograph during the evidentiary portion of the trial was strategic and not due to an inability to locate the Facebook photograph or to discuss the photograph with Burdyn.

Plaintiff's decision to not address the purported meaning of the "money ball" photograph, either in its Instagram or Facebook form, also hurts Plaintiff's earlier assertion of "unfair surprise" as a basis for the photograph's exclusion. Even crediting Plaintiff that she was surprised by the Defendant's use of this

For similar reasons, it cannot be said that the introduction or admission of the Facebook photograph at trial would "probably have changed the outcome of the trial." The Facebook photograph only serves to show where Plaintiff was when the photograph was posted. It does not establish that the "money ball" photograph was only a reference to golf or that it was unrelated to the lawsuit or the events surrounding the lawsuit.[14] In addition, Plaintiff explained at trial that she was a golfer, an assertion confirmed by her mother, and that the photograph at issue was related to golf and not the lawsuit. An additional post, confirming that she was at a country club the day that the photograph was posted, does not make it "probable" that the outcome of the trial would have been different, but for the jury not knowing where Plaintiff was when the "money ball" photograph was posted.

In light of the aforementioned analysis, Plaintiff has failed to meet her "heavy burden" of establishing that she is entitled to a new trial on the basis of newly discovered evidence, *i.e.*, the Facebook photograph.

Finally, Plaintiff contends that Semenza's counsel, Attorney Goldberg, engaged in attorney misconduct. The basis for this serious accusation appears to be that Attorney Goldberg's conduct "intentional or otherwise, led to the improper use and/or

---

photograph during cross-examination, Plaintiff had the ability to overcome this surprise, and any resulting prejudice, through re-direct and rebuttal.

[14] The Court notes that the additional information contained in the Facebook post indicates that Plaintiff was with Stephen Lowe at the time the photograph was posted, the individual who the jury had previously heard referred Plaintiff to a civil attorney upon hearing Plaintiff's allegations against the individual defendants, arguably rendering it even less probable that this Facebook post would "have changed the outcome of the trial."

mischaracterization of the money ball photo at trial, and . . . said photo colored the jury's impression of the Plaintiff and/or the merits of her claims. . . ." (Doc. 450, at 13). Although Plaintiff's counsel admits that they "ha[ve] no way of proving that Attorney Goldberg (or his co-counsel) knew that the alternate Facebook version of the money ball photo existed, or that he elected to put forth the Instagram version because it was the only one that would give credence to the false narrative that Plaintiff was only out for money," Plaintiff's counsel states that "all other references to Plaintiff's presence on social media throughout the entire course of these proceedings pertained to her Facebook page." (Id.).

The District Court "is entrusted with wide discretion in matters relating to the conduct of counsel during trial" and a new trial due to attorney misconduct should be granted "only where the allegedly improper statements or conduct make it 'reasonably probable' that the verdict was influenced by the resulting prejudice." *Forrest v. Beloit Corp.*, 424 F.3d 344, 351-352 (3d Cir. 2005) (citing *Greenleaf v. Garlock*, 174 F.3d 352, 363-364 (3d Cir. 1999); *Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227, 1236 (3d Cir. 1994)).[15] To establish entitlement to a new trial, "the party seeking a new trial must demonstrate that the attorney's

---

[15] See also, *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171 (3d Cir. 1992):

[The Third Circuit's] standard of review with respect to the award of a new trial for prejudicial conduct by counsel is deferential. "We recognize that the trial judge has considerable discretion in determining whether conduct by counsel is so prejudicial as to require a new trial." *Draper v. Airco, Inc.*, 580 F.2d 91, 94 (3d Cir. 1978) (citations omitted). Because the trial judge was present and able to judge the impact of counsel's remarks, we defer to his assessment of the prejudicial impact.

*Id.* at 207.

conduct constitutes misconduct, and not merely aggressive advocacy, and that the misconduct is prejudicial in the sense of affecting a substantial right in the context of the entire trial record." *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F.Supp.2d 181, 260 (D. Del. 2001) (citing 12 James Wm Moore et al., *Moore's Federal Practice,* § 59.13[2][C] (3d ed. 2000)). New trials on the basis of attorney misconduct are generally only granted where that misconduct was pervasive. *Vandenbraak v. Alfieri*, 2005 WL 2673858, at *2 (D. Del. 2005) (collecting cases), *aff'd* 209 F.App'x 185 (3d Cir. 2006)("we have consistently held that the amount of alleged improprieties matters for determining whether it is reasonably probable that counsel's arguments are prejudicial.").

As this Court has previously explained in this memorandum opinion, the "money ball" photograph was used for impeachment purposes and not subject to mandatory disclosure prior to trial pursuant to Rule 26 and the record reflects that Attorney Goldberg's use of the photograph and subsequent references to it did not exceed the bounds of zealous or aggressive advocacy expected of an attorney in service to his client. For Plaintiff to suggest that Attorney Goldberg engaged in misconduct because he used Plaintiff's Instagram photograph instead of "the alternate Facebook version of the money ball photo", asks this Court to find misconduct where none exists. Plaintiff asks this Court to divine Attorney Goldberg's knowledge of the existence of the Facebook photograph without any factual support where Plaintiff's counsel themselves profess to being unaware of that photograph. At trial, Attorney Goldberg questioned Burdyn on a number of issues, and his questioning of

Burdyn with respect to the photograph constituted a relatively brief portion of his cross-examination.[16] Following his cross-examination of Burdyn, Attorney Goldberg again only briefly referenced the "money ball" photograph. Attorney Goldberg did not make any inflammatory or improper statements about this photograph during the trial or mischaracterize this evidence. Looking at Attorney Goldberg's questions and comments relating to the "money ball" photograph as a whole, his actions do not even approach misconduct, let alone "pervasive" misconduct, that may entitle a party to a new trial.

For these reasons, as well as those set forth in addressing Plaintiff's other arguments with respect to the "money ball" photograph, the Court finds that Attorney Goldberg did not engage in any attorney misconduct.

For the foregoing reasons, Plaintiff's motion for a new trial on the basis that the "Court erred by permitting Defense counsel to improperly use, publish and admit into evidence a previously undisclosed photograph" (Doc. 450, at 6) will be denied.

## B. The Testimony of Kimberly Buggey Davies

Plaintiff next argues that "[t]he Court erred by not permitting Plaintiff's counsel to impeach witness Kimberly Buggey Davies." (Doc. 450, at 13). According to Plaintiff, Kimberly Buggey Davies (hereinafter "Davies"), "had previously provided, both via sworn statement and deposition, pertinent information regarding such things as her own personal

---

[16] Attorney Goldberg's initial cross-examination of Plaintiff spans 42 pages of the trial transcript. (See Trial Tr., February 1, 2017, at 43-85). All questions related to the "money ball" photograph are found on the last four pages of Attorney Goldberg's cross-examination. (See id. at 81-85).

belief that Semenza and Plaintiff had a sexual relationship, and that Semenza, while police

chief, had often wielded his power improperly by ordering his subordinates to 'fix' parking

and traffic citations for certain individuals, and by threatening to alter the schedules of

anyone who did not obey his commands." (*Id*. at 13-14). However, Plaintiff asserts that

"when Mrs. Davies denied these earlier statements, which she made under oath, Plaintiff's

counsel was not permitted to impeach her with her previous testimony." (*Id*. at 14).

Despite Plaintiff's assertion that she was denied the opportunity to impeach Davies,

her brief in support of the present motion does not cite to any specific portion of the record

in support of this argument; nor could it as a careful review of the record demonstrates that

Plaintiff's broad assertion is unsupported by any of the events at trial.

On January 31, 2017, the second day of trial, Plaintiff called Officer Kimberly Buggey

Davies as a lay witness. Prior to taking the witness stand, counsel for the Borough of Old

Forge requested a sidebar conference for an offer of proof. During the sidebar

conversation, Plaintiff's counsel explained:

> [Davies] gave a statement to the State Police, said multiple things. She
> believed, as a reasonable woman, that Semenza and my client were having
> sex. She overheard officers in the police department say that she was having
> sex. She heard fire department members --
>
> . . .
>
> Officers in the police department saying that they were having sex. She heard
> fire department members say the same thing. And I think it's very relevant to
> Mr. Semenza's position that he has done nothing, and, frankly, when she was
> deposed, she said she never heard or saw anything, which is in complete
> contradiction to her witness statement. . . .

36

(Trial Tr., January 31, 2017, at 45-46).

In response to this offer of proof, and counsel for Old Forge Borough's objection that

Plaintiff's counsel was attempting to "elicit multiple hearsay from Ms. Davies" as well as

"opinion testimony from her that's not factually based", the Court engaged in the following

exchange with Plaintiff's counsel:

> **The Court**: Well, Mr. Slocum, I'm not going to preclude you from calling Ms.
> Buggey [Davies], but to the extent that her testimony is that she overheard
> things or heard things or formed a belief, those are going to be objectionable,
> I'm putting you on notice, in the interest of giving you a fair shot here.
> I think Mr. Coleman's objections are well-taken.
>
> **Attorney Slocum**: What about for impeachment purposes, when I asked her
> directly and she denied, and she's giving statements to the State Police that
> say the contrary?
>
> **THE COURT**: If you ask for a statement and she denies it and you have
> something that is, in fact, a basis to impeach her, you can try and do it, that's
> not what I'm talking about here right now.

(*Id.* at 46-47).

Despite the Court's statement that Plaintiff's counsel could try to impeach Davies if

counsel had a basis for doing so, broadly construing Plaintiff's arguments with respect to

Davies, Plaintiff appears to now assert that she was prevented from impeaching Davies with

respect to prior statements she made about "her own personal belief that Semenza and

Plaintiff had a sexual relationship, and that Semenza, while police chief, had often wielded

his power improperly by ordering his subordinates to 'fix' parking and traffic citations for

37

certain individuals, and by threatening to alter the schedules of anyone who did not obey his commands." (Doc. 450 at 13-14).

At trial, Davies testified that she had been a police officer with the Borough of Old Forge since 2003 and that she was a patrol officer for the Borough from 2004 to 2007, at which time she became full-time and worked the night shifts from 2007 to 2012. (Trial Tr., January 31, 2017, at 48, 49, 51). Davies explained that she knew Burdyn by virtue of Davies' employment as a police officer and Burdyn's position as a fire fighter. (*Id.* at 49, 68-69).

The Court first turns to Plaintiff's assertion that "Semenza, while police chief, had often wielded his power improperly by ordering his subordinates to 'fix' parking and traffic citations for certain individuals, and by threatening to alter the schedules of anyone who did not obey his commands", and that Plaintiff was in some way prevented from impeaching Davies on this issue. At trial, Davies testified that she did not have any disagreements with Semenza; did not have any issues with Semenza with respect to her schedule and did not "remember or recall" whether any of the other officers had issues with Semenza regarding scheduling. (Trial Tr., January 31, 2017, at 52-53; *see also*, *id.* at 56). Following this testimony by Davies, Plaintiff's counsel requested that she read to herself a portion of Plaintiff's Exhibit 41-A[17]. At that time, the Court asked counsel whether he was "going to lay a foundation for the introduction of this [document]", to which Plaintiff's counsel responded

---

[17] A review of Plaintiff's exhibit list shows that Plaintiff's Exhibit 41-A was Davies' interview with the Pennsylvania State Police on May 8, 2012.

that he was "just trying to refresh her recollection." (*Id.* at 53). Counsel then asked whether

this document "refresh[ed her] recollection as to whether or not [she] had issues with Mr.

Semenza and [her] schedule." (*Id.* at 53-54). In response, Davies testified:

> **Mrs. Davies**: I wouldn't say I had issues, I would say that, at night, when I
> worked the night shift, I was kind of the commander, so I was in charge of the
> other guys under me that you, know, it was basically, Get these guys to do what
> they need to do at night.

> **Attorney Slocum**: So the people under you had issues with scheduling, is that
> what you're saying?

> **Mrs. Davies**: No, with him stating to me that, you know, Don't make me change
> your schedule, it was the other officers under me that were part-time officers
> that I was kind of in charge of to make sure everything ran smoothly, you know,
> basically, to get them to get up and do their job at night and not just sit in the
> station or, you know, get them out to patrol, get them out to see what's going
> on in the town.

(*Id.* at 54). Although Plaintiff's counsel then asked several follow-up questions, at no time

did he attempt to impeach Plaintiff with the document that he asked her to read or with any

other document or prior testimony.

With respect to Davies' testimony about "parking and traffic citations" and Semenza's

purported threats to "alter the schedules of anyone who did not obey his commands",

Davies testified at trial that she "didn't deal with parking tickets" and did not know whether

any officers were asked to make sure that parking tickets did "not make it to the magistrate

[judge's office]" (Trial Tr., January 31, 2017, at 57). However, Davies testified that she

"heard officers say that their traffic citations never went down" but that she "never personally

had a problem with any of [her] citations." (*Id.* at 58). Davies further denied that Semenza

39

ever asked her to alter any reports that she drafted, including those which related to him. (*Id.* at 58-59). At no time during Plaintiff's counsel's questioning on these issues did he attempt to impeach Davies with any "sworn statement and deposition" by her, despite counsel's current claims that he was prohibited from so doing (Doc. 450, at 13-14).

Finally, to the extent that Plaintiff asserts that she was prevented from impeaching Davies with respect to prior statements she made about "her own personal belief that Semenza and Plaintiff had a sexual relationship", the record reflects that, once again, Plaintiff's counsel never attempted to impeach Davies at trial on any statement she made about her knowledge, or lack thereof, of any relationship between Semenza and Burdyn. At trial, Davies testified that she had seen Burdyn interact with Semenza and had seen Plaintiff in a borough police cruiser with Semenza on "[m]aybe a few occasions." (Trial Tr., January 31, 2017, at 59, 60, 62). Davies further testified that she never heard Semenza say anything inappropriate about Plaintiff and that she never saw any inappropriate actions between Semenza and Burdyn. (*Id.* at 63). At no time during counsel's direct examination of Davies on this issue did he reference any past testimony or statements by Davies or attempt to impeach her with such evidence.

Following Defense counsels' cross-examination of Davies, Plaintiff's counsel requested a side-bar prior to beginning his re-direct. At that time, the following exchange took place:

**Attorney Slocum**: When she was interviewed by the Pennsylvania State Police, she stated that she believed Semenza and my client were having sex.

You previously ruled that was an opinion and was not admissible. I just want to raise my objection to the Court, and under 701, it's opinion testimony, it doesn't require scientific evidence, it's her personal feeling, based upon things she saw and observed, and I should be able to ask that question.

**The Court**: Well, Mr. Slocum, my approach to this is not because it requires a professional opinion, my objection is that she has never indicated any foundation for her belief, and her testimony, just now, hasn't done it. If you want to try, you go right ahead, but you do it at your own peril. Gentlemen, a belief, without any basis is absolutely inadmissible.

**Attorney Slocum**: Without asking the question –

**The Court**: You can't build the basis -- you can ask your question, as I said, ask your question, and if it's unobjectionable, then, you can ask her the question. But I'm not simply going to allow you to say, Did you believe something? It's not enough. You need a foundation for her belief. I'm not letting her belief in as part of the foundation.

(Trial Tr., January 31, 2017, at 74-75).

On redirect, when Plaintiff's counsel asked Davies whether she had ever seen (1) Semenza and Burdyn "interact alone in the police department"; (2) Semenza and Burdyn kiss each other; (3) or Burdyn sit on Semenza's lap, Davies responded in the negative. (*Id.* at 76). Plaintiff's counsel did not thereafter attempt to impeach Davies with any prior inconsistent statement wherein she indicated any personal knowledge of any of the afore-mentioned subjects.

Here, the record reflects that at no time did the Court prohibit Plaintiff's counsel from attempting to impeach Davies "with her previous testimony" when Davies "denied [her] earlier statements, which she made under oath" (Doc. 450, at 14). Instead, the Court specifically told Plaintiff's counsel that "[i]f you ask for a statement and [Davies] denies it

41

and you have something that is, in fact, a basis to impeach her, you can try and do it." (Trial Tr., January 31, 2017, at 47). Prior to Plaintiff's counsel's redirect, the Court only explained to counsel the fundamental rules of evidence that a witness must have personal knowledge of the matter upon which she is being asked to testify and that a lay witness's testimony in the form of an opinion must be rationally based on that witness's perception. *See* Fed. R. Evid. 602, 701.[18] The Court in no way precluded Plaintiff's counsel from attempting to impeach Davies with her prior testimony or statements, nor did the Court rule on the admissibility of any prior testimony or statements. Plaintiff cannot now assign error to the Court for not permitting counsel to ask certain questions when counsel never sought to ask those questions at trial or impeach the witness with any prior inconsistent statements.

---

[18] The Third Circuit recently explained the contours of Rule 701 as follows:

> Rule 701 means that a witness is only permitted to give her opinion or interpretation of an event when she has some personal knowledge of that incident. The objective of such testimony is to put "'the trier of fact in possession of an accurate reproduction of the event.'" In other words, "'lay opinion testimony is permitted under Rule 701 because it has the effect of describing something that the jurors could not otherwise experience for themselves by drawing upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" This rule recognizes the reality that "eyewitnesses sometimes find it difficult to describe the appearance or relationship of persons, the atmosphere of a place, or the value of an object by reference only to objective facts." Accordingly, it permits witnesses "to testify to their personal perceptions in the form of inferences or conclusory opinions."

> Importantly, the rule is carefully designed to exclude lay opinion testimony that "amounts to little more than choosing up sides, or that merely tells the jury what result to reach." . . . .

*United States v. Fulton*, 837 F.3d 281, 291-292 (3d Cir. 2016) (footnotes omitted). At trial, this Court allowed Plaintiff's counsel to attempt to elicit testimony from Davies demonstrating that she had personal knowledge for any belief that there was an inappropriate sexual relationship between Semenza and Burdyn. Davies did not offer any testimony which could lay a foundation for such a belief, thus preventing Plaintiff from questioning Davies about any personal beliefs on this issue.

For the foregoing reasons, the Court will deny Plaintiff's motion for a new trial on the basis that the Court erred by not permitting Plaintiff's counsel to impeach witness Kimberly Buggey Davies.

## C. The Testimony of Lawrence Enderline

With respect to purported trial errors which would require the grant of a new trial, Plaintiff last argues that the Court erred "by not allowing [Plaintiff's witness] Lawrence Enderline to testify." (Doc. 450, at 14). Specifically, Plaintiff asserts that Enderline should have been allowed to testify as to a statement he said he heard in the fall of 2008 wherein "he heard Semenza proclaim that he wanted Plaintiff to 'come here' because he 'wanted to fuck her'." (Id. at 15). Plaintiff argues that:

> the statement in question was relevant because it spoke to Semenza's state of mind, and because it very well could have been interpreted as evidence that an improper relationship existed previously. Furthermore, this statement directly contradicted Semenza's ongoing and steadfast denial that he had ever, at any point, said or done anything improper to Plaintiff, and any question as to the relevance of the statement and its correlation, if any, to the acts alleged should have been decided by the trier-of-fact, not This Court.

(Id.).[19]

In the afternoon of the second day of trial, the Court held a conference outside the presence of the jury after being advised that "there is a request for an offer of proof" with

---

[19] The Court notes that Plaintiff's argument that the Court erred "by not allowing Lawrence Enderline to testify" does not cite to any case law or point the Court to any Federal Rule of Evidence or other legal authority which may support the admission of the statement in question. This is a continual problem throughout Plaintiff's brief in support of her motion for a new trial and leaves this Court to frequently guess the precise legal basis for Plaintiff's arguments, both here and in support of her other asserted grounds for a new trial.

43

respect to Lawrence Enderline, the next witness that Plaintiff intended to call. (Trial Tr.,

January 31, 2017, at 135). At that time, Plaintiff's counsel explained that "[t]he testimony I'd

like to bring in is he [Enderline] heard Defendant Semenza say [about Burdyn], Hey, I

haven't seen you for a while. I want to 'f' you, come over here and sit on my lap, I want to 'f'

you right now." (Id.). Plaintiff's counsel argued that these statements, made in 2008,

"would apply to the harassment charges, as well as Mr. Semenza's denial of the underlying

allegations." (Id.).[20]

The Court thereafter held a hearing wherein Enderline was sworn-in outside the

presence of the jury to provide the Court with the testimony that he intended to offer at trial,

and specifically "what he heard, who said it and when he heard it." (Id. at 138-139). During

the hearing, Enderline testified that in the fall of 2008:

> We had come back from a call one day, and [Burdyn] came to the door, she
> was coming for a check, and [Semenza] said -- she came in the door and he
> said, Hey, I haven't seen you in a while, come on over, sit down on my lap, I
> want to fuck you.

---

[20] In October, 2015, Semenza pleaded guilty in state court to Harassment (18 Pa.C.S.A. §
2709(a)(7)), a misdemeanor in the third degree. At the time of the guilty plea, Semenza admitted that
"between November of 2004 and March of 2006 in Lackawanna County, [he] did with the intent to annoy,
harass or alarm another communicate repeatedly with [Burdyn], a minor female, in a manner which served
no legitimate purpose." (Doc. 258, at Ex. J).
  While Semenza pleaded guilty to Harassment under 18 Pa.C.S.A. § 2709(a)(7), it should be noted
that another subsection of the Harassment statute, 18 Pa.C.S.A. § 2709(a)(4), states that the person
"communicates to or about such other person any lewd, lascivious, threatening or obscene words,
language, drawings or caricatures." Thus, although Semenza pleaded guilty to communicating with Burdyn
"in a manner which served no legitimate purpose", the charge to which Semenza pleaded guilty does not
encompass communications consisting of "lewd, lascivious, threatening or obscene words [or] language",
thus further weakening Plaintiff's argument that Enderline's testimony "would apply to the harassment
charges."

(Trial Tr., January 31, 2017, at 139-140).

After hearing Enderline's testimony and the respective arguments of counsel, the

Court made the following determination:

> I've given consideration to it, I understand what the statement is. My determination is not based on the fact that it's a boorish statement, although, it certainly is, but essentially, I don't see an exception within [Fed. R. Evid.] 404 to allow it, and when I do the essential balancing test under [Fed. R. Evid.] 403, its relevance in this case is minimal, largely, because, at this point, Ms. Burdyn is 19 years old, nor does it have anything -- and by reasonable inference -- nothing in that statement by reasonable inference indicates prior activity by Mr. Semenza. If it did, I would let it in.
>
> And thirdly -- or, at least, I would consider letting it in, but there's not enough there, there's not enough here to show me that this has any bearing on the events in question. We all understand, at this point, in this case, we all understand what the relevant time period is, do we not? It's 2004 to 2007. Now, if someone disagrees, tell me now.[21]
>
> So a statement in 2008 or 2009 that doesn't have any indication of a reflection back, other than, I haven't seen you in a while, which in and of itself, is entirely innocuous, is not going to be admissible. So to the extent you're calling Mr. Enderline for that purpose, I'm not allowing it.

(*Id.* at 146-147).

As previously explained, the Rule 403 balancing between the probative value of the

evidence sought to be excluded and the prejudicial effect if the evidence is admitted, is "at

its core, an essentially discretionary one that gives the trial court significant latitude to

exclude evidence." *Johnson*, 283 F.3d at 156. The party asserting error must therefore

---

[21] The Court's statement that the relevant time period was 2004 to 2007 was not disputed by anyone. *See also*, *infra*, at n. 22.

"show the district court's action was arbitrary, fanciful or clearly unreasonable", and the trial court's exercise of discretion will not be disturbed "unless no reasonable person would adopt the district court's view." *Stecyk*, 295 F.3d at 412.

This Court, in exercising its discretion in conducting a Rule 403 balancing analysis, did not err in determining that Enderline's testimony with respect to what he heard Semenza say in 2008 should be excluded. The probative value of this specific testimony by Enderline was substantially outweighed by a danger of unfair prejudice, confusing the issues, and misleading the jury. Here, the testimony with respect to Semenza's statement was of little probative value. The allegations at issue during the trial concerned purportedly inappropriate conduct by Semenza, Krenitsky, and Chiavacci from 2004 to 2007[22], and the Old Forge Borough and OFHEC's actions, or inaction, relative to that conduct during that time period. Further, Enderline's testimony, that Semenza stated that he "want[ed] to fuck" Plaintiff was both prospective and a statement of intent, in addition to being made when Plaintiff was 19, and therefore no longer a minor. Importantly, despite Plaintiff's counsel's argument during the hearing that the statement "implies [Semenza] has, in the past" done something and that "[y]ou wouldn't make a statement like that to someone you haven't already had such contact with" (Trial Tr., January 31, 2017, at 143), Plaintiff's counsel later

---

[22] Plaintiff's Amended Complaint only alleged violations by Chiavacci, Semenza, and Krenitsky from 2004 to 2007. The sexual assault by Chiavacci occurred on or about July 10, 2004. (Doc. 179, at ¶ 18). The allegedly inappropriate contact with Semenza began in 2004 and "[i]n or about 2007, during Plaintiff's senior year of high school, as Plaintiff neared the age of eighteen (18), Semenza's sexual advances towards Plaintiff began to fade and eventually ended." (*Id.* at ¶ 77). With respect to Krenitsky, Plaintiff's allegations of sexual misconduct were limited to the first six months of 2005. (*Id.* at ¶¶ 81, 85).

admitted that there would be no testimony that Semenza and Burdyn ever engaged in sexual intercourse (*id.* at 146). In light of these considerations, Enderline's testimony presented a substantial risk of unfair prejudice and confusing the issues by presenting the jury with an alleged statement made in 2008, after Plaintiff was no longer a minor and outside the relevant time period, which did not reference or imply past misconduct, but rather demonstrated boorish and inappropriate behavior which may have improperly influenced the jury. *See e.g., Bhaya*, 922 F.2d at 188 ("Evidence that a party committed wrongs other than those at issue in a case often creates a danger of 'unfair prejudice' because such evidence may influence a jury to return a verdict based on a desire to punish for the other wrongs."). Testimony regarding Semenza's purported statement also presented a danger of misleading the jury as it was prospective in nature, not retrospective, and did not clearly relate to the allegations at issue in this action, *i.e.*, whether Semenza engaged in inappropriate sexual conduct with Burdyn from 2004 to 2007. For these reasons, the Court did not err in excluding Enderline's testimony with respect to what he heard in the fall of 2008 pursuant to Rule 403.

Exclusion was also warranted under Federal Rule of Evidence 404. Pursuant to Rule 404, character evidence is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait. Fed. R. Evid. 404(a)(1). Similarly, "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the

character." *Id.* at 404(b)(1). However, this evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Nonetheless, evidence that is relevant pursuant to Rule 404(b) is still subject to the general strictures limiting admissibility under other federal rules of evidence, including Rule 403. *See Huddleston v. United States*, 485 U.S. 681, 687-688, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) (if evidence is offered for "a proper purpose [under Rule 404(b)], the evidence is subject only to general strictures limiting admissibility such as Rules 402 and 403"); *Becker*, 207 F.3d at 189 (setting forth a four-prong test to determine admissibility of Rule 404(b) evidence, including that "its probative value must outweigh its prejudicial effect under Rule 403")). Thus, even if Enderline's statement were otherwise admissible under Rule 404, the Court's determination that Enderline's statement was inadmissible under Rule 403 precluded Enderline's testimony on this issue.

In addition, Plaintiff "point[s] out that Mr. Enderline was actually permitted to testify about the statement in question at Semenza's criminal trial" and argues that "[i]f this testimony was deemed relevant and probative enough so as to be used against Semenza when his very liberty was at stake, surely it should have been allowed at his civil trial, where both the stakes and the ultimate burden of proof were significantly less." (Doc. 450, at 15). Apart from the fact that, unlike here, Semenza's state court criminal trial was governed by the Pennsylvania Rules of Criminal Procedure and Pennsylvania Rules of Evidence, Plaintiff

offers no authority for the proposition that this Court is either bound by, or should consider persuasive, an evidentiary ruling by a state court judge in a criminal trial, nor does Plaintiff state whether there was even any objection to Enderline's state court testimony.

For the foregoing reasons, Plaintiff's motion for a new trial on the basis that "the Court erred by not allowing Lawrence Enderline to testify" will be denied.

## D. The Motion to Dismiss

Plaintiff's final assertion of error is directed at this Court's Order and Memorandum Opinion (Docs. 175, 176), dated July 1, 2015, wherein the Court granted in part and denied in part Defendant Old Forge Borough's motion to dismiss. Specifically, Plaintiff argues that the Court erred by dismissing Count V of Plaintiff's Amended Complaint. (Doc. 450, at 16-21). Count V, entitled "42 U.S.C. § 1983 – Violation of Substantive Due Process – Actions of Person with Final Authority", alleged that the Old Forge Borough[23] violated Plaintiff's substantive due process rights through the actions of Semenza, "a person with final authority."[24] (Doc. 125, at 32).

---

[23] Count V of Plaintiff's Amended Complaint was brought against the Old Forge Borough, Old Forge Police Department, and Old Forge Fire Department. However, the Court granted Defendants' motion to dismiss the Old Forge Police and Fire Departments, finding that those entities were sub-units of the Old Forge Borough (Doc. 175, at 11-14). Plaintiff does not challenge the dismissal of these two defendants.

[24] Although Count V of the Amended Complaint alleged that Semenza was a policy-maker for both the Police Department and OFHEC for purposes of imposing liability on Old Forge Borough, Plaintiff's Rule 59 motion only challenges the Court's conclusion that Semenza was not a policy-maker for the Police Department.

49

Plaintiff submits that the Court "committed an error of law when it dismissed Count V of Plaintiff's Complaint on a Motion to Dismiss", and thus "requests a New Trial pursuant to Federal Rule of Civil Procedure 59." (Doc. 450, at 21). Despite Plaintiff's reference to a new trial, Plaintiff's request is in actuality a motion to alter or amend a judgment pursuant to Rule 59(e), which is otherwise considered as a motion for reconsideration. As such, "[a] proper Rule 59(e) motion . . . must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (citing *N. River Ins. Co.*, 52 F.3d at 1218). "Rule 59(e) permits a court to alter or amend a judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810.1, pp. 127-128 (2d ed. 1995)). "Motions under Rule 59(e) should be granted sparingly because of the interests in finality and conservation of scarce judicial resources." *Ruscavage v. Zuratt*, 831 F.Supp. 417, 418 (E.D. Pa. 1993).

In granting the Borough of Old Forge's motion to dismiss as to Count V, the Court found that Semenza did not have final policy-making authority such that his conduct represented official policy because Plaintiff had not adequately pleaded that, as a matter of state law, Semenza as the Old Forge Borough Chief of Police was responsible for making

policy in the particular area of municipal business in question or that Semenza's authority to make policy in that area was final and unreviewable. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 245-246 (3d Cir. 2006). Plaintiff's current Rule 59 motion does not directly challenge this finding, instead arguing that the Court erred in not addressing a different circumstance set forth in *Kutztown* which may allow an individual's conduct to implement official policy or practice: where "a final policy-maker render[ed] the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred." (*See* Doc. 450, at 18-19; *Kutztown*, 455 F.3d at 245). In other words, as applied to this case, Plaintiff is arguing that the Court did not analyze a claim that the Old Forge Borough Mayor and Council rendered Semenza's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying his conduct or speech after it occurred.

In her current motion, Plaintiff has set forth eleven "facts [which] were uncovered" during the course of discovery which she claims demonstrate that Semenza may have been a final policy-maker. (Doc. 450, at 16). However, as noted by Old Forge Borough, "Plaintiff confabulates its duty to put forth a well pleaded Amended Complaint and issues developed during the course of discovery." (Doc. 455, at 11). On a motion to dismiss, the plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129

S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Though a complaint 'does not need detailed factual

allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'"

*DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A court "take[s]

as true all the factual allegations in the Complaint and the reasonable inferences that can be

drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A.*

*France v. Abbott Labs.*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and

quotation marks omitted).

Here, with respect to the delegation of duties to Semenza as Chief of Police, Plaintiff

alleged in Count V of her Amended Complaint:

> The Mayor may . . . delegate to the Chief of Police supervision over and
> instruction to subordinate officers in the manner of performing their duties.
> . . .
>
> At all relevant times, the Mayor of Old Forge, together with Borough Council,
> delegated the operations of the Police Department to Semenza as Officer and/or
> Chief of the Old Forge Police Department.
>
> Old Forge Borough granted Semenza the final authority to establish municipal
> policies for the Police Department.
>
> Semenza's final authority is evidenced by the General Order Policies and
> Procedures Manual of the Old Forge Police Department in which each and every
> policy and procedure is signed by the order of Lawrence A. Semenza, Chief of
> Police.
> . . .

The decisions and actions of Semenza acting in his official capacity, and acting directly as a final government decision maker, reflected and represented the policies and procedures of Defendant Old Forge Borough, [and] the Old Forge Police Department. . . .

(Doc. 125, ¶¶ 122, 124-126, 131).

As the Court noted in its prior memorandum opinion:

Plaintiff's amended complaint, citing the Official Police Department Policy and Procedure Manual (Doc. 125, Ex. C), states that "Semenza's final authority is evidenced by the General Order Policies and Procedures Manual of the Old Forge Police Department in which each and every policy and procedure is signed by the order of Lawrence A. Semenza, Chief of Police." (Doc. 125, ¶ 126). A review of this exhibit reveals that none of the policies are signed by Semenza, nor is there any reference to him. Rather, the first page of the Policy and Procedure Manual indicates that it was "approved and implemented" on July 6, 2004, below which is the name of Anthony Torquato, Mayor of Old Forge.

(Doc. 175, at 23 n.6). Thus, this facially false factual allegation does not advance Plaintiff's claim in any way. As a result, Plaintiff's remaining allegations with respect to the delegation by Old Forge Borough Mayor and Council of "authority to act or speak for the government", specifically that the "Mayor of Old Forge, together with Borough Council, delegated the operations of the Police Department to Semenza as Officer and/or Chief of the Old Forge Police Department" and that "Old Forge Borough granted Semenza the final authority to establish municipal policies for the Police Department" (Doc. 125, at ¶¶ 124, 125) amount to nothing more than conclusory statements and a generalized formulaic recitation of one of the elements necessary to support Plaintiff's cause of action.

Nonetheless, the Court need not revisit in depth its decision on the Old Forge Borough's motion to dismiss. Plaintiff is instead faced with a fundamental, and arguably

insurmountable, hurdle in requesting reconsideration and ultimately a new trial with respect to Count V: the jury's finding that neither Semenza nor Krenitsky were acting under color of state law (see Doc. 429, at 2-3).

Even if this Court were to amend its order granting Defendants' motion to dismiss Count V, this would serve no useful purpose as the jury rendered a finding that Semenza and Krenitsky were not acting under color of state law at the relevant times and that therefore Plaintiff did not suffer any constitutional violation. Because of the jury's findings, Plaintiff would be unable to succeed on Count V and the resulting judgment in favor of the defendants on Plaintiff's federal claims would remain unchanged. See 11 C. Wright & A. Miller, Federal Practice & Procedure § 2810.1, at 171 (2012) ("amendment of the judgment [pursuant to Rule 59(e)] will be denied if it would serve no useful purpose.").

The Third Circuit has repeatedly found that even where the Court may have erred in ruling in favor of a municipality-defendant either prior to trial or prior to the jury rendering a verdict, where the jury's verdict would foreclose the imposition of liability on that municipality-defendant, the error is harmless. For example, in *Grazier ex rel. White v. City of Philadelphia*, the Third Circuit found that:

> The District Court correctly determined that any error in granting judgment for the City at the close of the plaintiffs' case would have been rendered harmless by the jury's verdict of no liability against [police officers] Hood and Swinton. There cannot be an "award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm." *Heller,* 475 U.S. at 799, 106 S.Ct. 1571. Because the jury in this case found no constitutional violation, *Heller* precludes a finding of municipal liability against the City. This conclusion follows naturally

54

from the principle that municipal liability will only lie where municipal action actually caused an injury. *See City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (observing that a City "may be held liable if its policy *actually causes injury*") (emphasis added).

328 F.3d 120, 124 (3d Cir. 2003). Similarly, in *Reiff v. Marks,* the Third Circuit explained:

We need not review the merits of the District Court's grant of summary judgment in favor of the Borough because a municipality may not be held liable on a failure to train theory when a jury has found that the plaintiff has suffered no constitutional violation. *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (explaining that no Supreme Court "cases authorize[ ] the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."

511 F.App'x 220, 223 (3d Cir. 2013). The Circuit again more recently declined to reverse a

District Court's entry of judgment in favor of a municipality-defendant prior to a jury verdict in

*Smith v. Gransden.* There, the Court stated:

Because we will not disturb the jury's verdict that Frampton [the supervising police officer] is not liable for any constitutional violations, there can accordingly be no derivative municipal claim based on Frampton's actions. Further, to the extent that [Plaintiff] argues that [the City of] Camden is nevertheless liable under § 1983 because its unwritten policy caused a constitutional violation through officers on the scene other than Frampton, her argument is similarly unavailing, as it requires proof that a [Camden Police Department] officer on the scene violated [Plaintiff's] constitutional rights by being deliberately indifferent to his medical needs. Here, the jury found [Plaintiff] did not prove any officer violated [Plaintiff's] rights and thus, Camden could not be found liable and we will not disturb the District Court's [grant of judgment as a matter of law in favor of the City of Camden].

553 F.App'x 173, 178 (3d Cir. 2014) (internal citations and quotation marks omitted).

Here, Plaintiff does not argue that the verdict was against the weight of the evidence

or otherwise challenge any portion of the jury's verdict, including the jury's findings that

neither Semenza nor Krenitsky were acting under color of state law when they were alleged to have engaged in sexual misconduct with Plaintiff. At trial, the jury further found that Semenza did not commit an assault or battery against Plaintiff. As such, even if Semenza was a policymaker for the Old Forge Borough, the jury found that Semenza was not using power that he possessed by virtue of state law when Plaintiff alleges he engaged in sexual misconduct. By further finding that Krenitsky was also not acting under color of state law when he engaged in sexual misconduct with Burdyn, neither Semenza, nor the Borough, can be held liable for Krenitsky's conduct with Burdyn. A predicate for the imposition of liability on the Borough is that the person whose actions Plaintiff seeks to use as a basis to impose liability on the Borough is a state actor – here that is not true.

It is axiomatic that to succeed on any § 1983 claim, a plaintiff must be deprived of a federal right. Because the jury found no state action by Semenza or Krenitsky, they necessarily found that no constitutional violation occurred and that Plaintiff was not deprived of her right to bodily integrity. Thus, Burdyn was not deprived of a constitutional right that can now be attributed to the Borough as a violation of Plaintiff's substantive due process rights by Semenza acting in a policy-making capacity. Moreover, even assuming that Semenza was a policymaker, Plaintiff would have to establish that Semenza's actions directly caused Burdyn to suffer a constitutional violation, an issue that is now foreclosed in light of the jury's verdict finding the absence of any constitutional violation. *See e.g., A.M. ex rel. J.M.K.*, 372 F.3d 572, 586 (3d Cir. 2004) ("Individual defendants who are

policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'") (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). Because the jury found there was no constitutional violation, Semenza cannot be held liable as a policy-maker and there is no harm for which Semenza's conduct can be a basis for liability under § 1983 that can be imputed to the municipality.[25]

In addition, Count IV of Plaintiff's Amended Complaint, which the Court declined to dismiss and which was ultimately a subject of the jury trial, alleged violations of § 1983 by the Old Forge Borough for failing to have a number of policies and procedures in place, for failing to adequately train members of the Police Department, including Semenza and Krenitsky, and for failing to supervise, oversee, monitor, control, curtail or restrain the actions of Semenza and Krenitsky. (Doc. 125, at ¶ 114). Nonetheless, Count V then alleged that the Old Forge Borough "granted Semenza the final authority to establish

---

[25] The Court recognizes that, in certain situations, the fact that an individual defendant did not violate a plaintiff's constitutional rights would not necessarily preclude a finding of liability on behalf of the municipality. As the Third Circuit explained:

> It is possible for a municipality to be held independently liable for a substantive due process violation even in situations where none of its employees are liable. . . . However, for there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights.

*Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) (internal citations omitted). This exception is not applicable here. Because Semenza and Krenitsky were not acting under color of state law, none of their actions constituted constitutional violations, and the Borough of Old Forge cannot be held liable for the actions undertaken by its employees only in their private capacities.

57

municipal policies for the Police Department." (Id. at ¶ 125). Even accepting this allegation in Count V as true, any actions by Semenza in establishing municipal policy would have been encompassed within Count IV. Furthermore, and critical to this Court's analysis and Plaintiff's present inability to revive Count V, Count V *only* alleged that as a result of the Old Forge Borough Mayor and Council's delegation, "Semenza made deliberate choices to utilize this authority to sexually assault the minor Plaintiff who was a volunteer with the Old Forge Hose and Engine Junior Firefighter Program." (Id. at ¶ 130). However, the jury found that Semenza was not acting under color of state law for purposes of establishing a constitutional violation and that Semenza did not commit any assault or battery against Burdyn. Thus, even if Semenza was a final decision-maker or policy-maker, there can be no liability imputed on the Borough in Count V for any alleged "deliberate choices" made by Semenza to misuse his authority where the jury has found that Semenza was not acting under color of state law. By finding no violation of Plaintiff's substantive due process rights by Semenza, the jury foreclosed the imposition of liability on the Borough for any use of Semenza's "authority to sexually assault" Plaintiff.

For the aforementioned reasons, Plaintiff's motion for a new trial on the basis that the Court erred in dismissing Count V of the Amended Complaint will be denied.

## V.    CONCLUSION

For the foregoing reasons, the Court will deny "Plaintiff's Motion for New Trial

Pursuant to Federal Rule of Civil Procedure 59" (Doc. 444).   A separate Order follows.

Robert D. Mariani
United States District Judge